Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff is a Florida corporation engaged in the business of selling utility services in the City of Panamá, Republic of Panamá. This suit arises out of a contract for the sale of manufactured gas by the plaintiff to the armed forces within the Canal Zone. The primary issue here involves the operation of a limiting clause designed to restrict price escalation under the contract. If the limiting clause is deemed to be unambiguous and subject only to the Government’s interpretation, the plaintiff requests that it be reformed by the court to correct a mutual mistake of the parties in failing to express their agreement in adequate form. The second issue involves the treatment of certain expense items in determining plaintiff’s operating expenses in connection with the price escalation provision of the contract.
Under date of June 30, 1938, plaintiff entered into a contract with the United States to supply manufactured gas to certain military establishments within the Panama Canal Zone. This contract (hereinafter referred to as the 1938 Contract) was to run for a period of five fiscal years, and was due to expire on June 30, 1943, subject to the requirement that the United States specifically renew the contract prior to the close of each fiscal year.
Late in 1940, representatives of the Government approached plaintiff with a view to negotiating a renewal of the gas supply contract in considerably increased amounts due to the expansion of Canal Zone defense facilities. Plaintiff stated that it had insufficient capacity to supply the increased needs and that it was unable to secure the necessary capital to expand its capacity. Plaintiff, therefore, proposed that defendant purchase its gas transmission and distribution lines within the Canal Zone in order to furnish plaintiff with a part of the funds necessary to defray the costs of expansion. Defendant agreed to this proposal.
Thereafter, under date of June 26, 1941, plaintiff and defendant entered into a contract supplementing the 1938 Contract. The Supplemental Contract provided for the purchase by defendant of plaintiff’s gas distribution system in the Canal Zone for a specified sum, and for the furnishing of gas by plaintiff to a designated list of military installa *293 tions within the Canal Zone, in addition to the installations covered by the 1938 Contract. Article 6(r) of the Supplemental Contract provided that it was to remain in full force and effect until June 30, 1941, but that it could be renewed annually at the option of the United States up to June 30, 1953. However, no renewal was to include more than one fiscal year. The contract was duly renewed for the full permissible period. As of July 1, 1943, all gas supplied to military installations serviced by plaintiff in the Canal Zone was provided under the terms of the Supplemental Contract. The initial delivery of gas by plaintiff under the Supplemental Contract was not made until sometime during the fiscal year 1943.
The first paragraph of article 6(p) of the Supplemental Contract set out base rates for each unit of gas. The unit was defined elsewhere as one MCF or 1,000 cubic feet of gas. Monthly billings were to be rendered on the basis of these base rates.
Because the plaintiff was to be obligated to supply gas under the Supplemental Contract to military installations for an additional 10 years at the option of the defendant, plaintiff’s representatives insisted that the contract contain a price escalation clause for the purpose of enabling plaintiff to recoup the anticipated increased costs during the period covered by the contract. The representatives of the War Department were generally opposed to contracts containing price escalation provisions, but they were confronted with a need for increased utility services for expanding military operations in the Canal Zone, and realized that the war situation made it impossible for the plaintiff to assume, the economic risk involved in a long-term contract without some degree of protection against the prospect of increased costs. Consequently, there was inserted in article 6(p) the provision that “the total annual payments to the contractor for gas consumed during any fiscal year shall be subject to annual adjustment * * *” which would reflect changes in the plaintiff’s fuel oil and commodity costs.
The fuel oil cost adjustment agreed to became article 6(p)a of the contract (referred to herein as the “fuel oil clause”). It allowed a price adjustment of ten cents per *294 MCF for eacli one cent or fraction thereof by which the cost of fuel oil might exceed four cents per gallon.
The parties’ agreement on a commodity cost adjustment became article 6(p)b of the contract (referred to herein as the “commodity clause”). This commodity clause provided for a price adjustment in the event of an increase in average MCF operating expenses (excluding fuel oil costs) in any fiscal year over such expenses in the base year (the calendar year 1940). All increases in excess of 10 percent over the base year average MCF operating expenses were reimbursable to plaintiff, and any decrease in excess of 10 percent was to be credited to the United States.
While the defendant’s representatives recognized the necessity for some type of price escalation clause, they had to comply with the requirements of the law which prohibited the War Department from contracting for supplies or services unless there was an appropriation available for the payment of such obligations. The need for an appropriation called for the ability to estimate the dollar cost of its requirements. Accordingly, the Government first proposed that the price escalation be limited to a fixed dollar amount to be stated in the contract. The Government’s negotiators informed plaintiff’s representatives that the suggested limiting clause was based on the necessity of having a definite figure which could be used in preparing the department’s budget for submission to the Congress each year. Plaintiff’s representatives refused to consider a lump-sum limitation on the ground that no one could foresee how long the war would last or what increases in the cost of labor and materials would occur during the term of the contract. After submitting further drafts of proposed limitations on price escalation, and after further negotiations, the parties agreed to and adopted article 6(p)e (referred to herein as the “limiting clause”) of the Supplemental Contract, which provided in pertinent part as follows:
In no event shall any annual adjustment in contractor’s famor under a and b above exceed 25 per centum of the average payment per each unit of gas made to the contractor during the preceding year. * * * (Emphasis supplied by the contracting parties.)
*295 The principal controversy in this case involves the interpretation of this limiting clause as it affects the price payable by the Government for gas purchased in each fiscal year.
The Government first tabes the position that the “annual adjustment in contractor’s famor under a [the fuel clause] and 5 [the commodity clause] ” refers to the payment which reflected increased fuel oil and commodity costs, as distinct from the monthly payments, which reflected only the base rates. It then interprets the limiting clause to mean that in no event shall any annual adjustment in contractor’s favor under article 6(p)a and article 6(p)b (the fuel oil and commodity clauses) exceed 25 percent of the average payment per each unit of gas made to the contractor during the preceding year.
Under the Government’s interpretation the maximum permissible average unit price in any year is the average payment per unit under the base rates plus the amount of annual adjustment (25 percent of the average payment per each unit of gas made to the contractor during the preceding year). Since the average payment per unit under the base rates fluctuated only slightly, the Government’s formula results in a maximum permissible increase over the base rates of 25 percent in the first year of operation under the contract. But the increase in the second year would be limited to the sum of the first year’s increase plus 25 percent of the first year’s increase. In the third year the increase would be limited to this second year’s increase plus 25 percent of the second year’s increase. The rate of increase would diminish so rapidly that, as a practical matter, there could be no further price escalation after the fourth year. And the maximum increase or adjustment could never exceed approximately 33% percent of the base rates during the entire ten-year life of the contract.
It is plaintiff’s position that, by the language contained in the limiting clause, the parties intended that the average payment per each unit of gas made to the contractor by the Government during any year could not exceed 125 percent of the average payment in the preceding year. The phrase “average payment per each unit of gas” in this con *296 text reflects the monthly payments under the base rates plus the annual adjustment in any one year in terms of an average unit price.
The Government objects to this interpretation on the ground that provision for a 125 percent permissible increase in the average unit price each year could be read into the contract only if the limiting clause is rephrased to read:
In no event shall * * * [the average payment per each unit of gas made to the contractor in the year under adjustment] exceed [by] 25 per centum * * * the average payment per each unit of gas made to the contractor during the preceding year.
Or, in the alternative:
In no event shall * * * [the average payment per each unit of gas made to the contractor in the year under adjustment] exceed * * * [125] per centum of the average payment per each unit of gas made to the contractor during the preceding year.
Although the rephrasing suggested by the Government would accomplish the result urged by the plaintiff, it constitutes something more than interpretation.
The plaintiff, however, denies that this rephrasing is necessary. On the contrary, it takes the position that the limiting clause is ambiguous. It contends that the words “annual adjustment,” per se, have no exact connotation, but that “they cannot be deemed inappropriate” to express the concept of a revision or adjustment of the price in the preceding year. If this is what “annual adjustment” means, the limiting clause does not on its face contain the complete formula or scheme for determining maximum permissible price escalation. According to plaintiff, the specified percentage (25 percent) of the prior year’s average unit price is not in itself the maximum annual adjustment, but only a factor in the determination of the maximum annual adjustment. The limiting clause, so the argument runs, thus provides a 25 percent factor, but is silent as to the manner of its application. Since the contract fails to spell out the next step, the plaintiff, relying on the intention of the parties, takes this 25 percent factor and adds it to the previous year’s average unit price in order to determine the maximum permissible *297 unit price for the year for which an increase in rates is sought. If the base rate component plus the amounts produced by the price escalation clauses in the year for which the increase is sought does not exceed this figure (i.e., the 25 percent factor added to the previous year’s average unit price) the increase under the price escalation clauses is allowable.
We cannot say, from a reading of the entire contract, that the limiting clause is subject only to the interpretation offered by either party. The Army itself changed its position on the interpretation of the limiting clause after the dispute over the application of the limiting clause arose. However, we believe that the language does favor the Government’s interpretation. Therefore plaintiff is not entitled to recover on Count I and its petition as to that count will be dismissed.
While it may be true that the words “annual adjustment” have no exact connotation if taken alone, they do not stand alone in the contract. The first paragraph of article 6(p) provides that:
Monthly billings shall be rendered on the basis of the rates specified above [referring to the base rates] * * *. However, the total annual payments to the contractor for gas consumed during any fiscal year shall be subject to annual adjustment as follows: (Emphasis supplied.)
Used in this context the words “annual adjustment” would appear to refer to an adjustment of the payments in the year for which the increase in rates is sought, and not necessarily to an adjustment of the average unit price paid in the preceding year.
In the limiting clause itself, the words “annual adjustment” do not stand alone, but are modified by the phrase “m contractor’s favor under a and b above.” This is susceptible to the interpretation that “annual adjustment” refers to the average unit price paid under the fuel oil and commodity clauses, as distinct from, and in addition to, the average unit price paid under the base rates.
Even though we might be persuaded that, as between these two conflicting interpretations, the language favors the Government’s interpretation, we do not believe that the plain *298 tiff’s interpretation is completely without merit. But regardless of which interpretation appears to be correct, we believe that the plaintiff’s request in Count II of its petition that the court correct a mutual mistake of the parties in failing to express their agreement in adequate form should be granted. It is not questioned that this court has equitable jurisdiction to reform a written instrument as part of its general power to render a money judgment. Olympia Shipping Corp. v. United States, 71 Ct. Cl. 251 (1930)
We have carefully studied the record, particularly the testimony of those witnesses who had a hand in negotiating and drafting the Supplemental Contract, and we are forced to conclude that the plaintiff has made out a strong, if not overwhehning, case for reformation. One of the chief negotiators for the plaintiff testified that it was the intention of both parties that the plaintiff could increase its rates so as to recoup increases in the cost of fuel oil and increased operating expenses, but that the limiting clause was put in the contract, at the Government’s insistence, to restrict total unit price to the Government to 25 percent over the total unit price paid in the preceding year.
Of more importance is the testimony of the Government’s chief negotiator. He stated emphatically that it was the intention of the Government in agreeing to the limiting clause that the maximum total unit price in any one year would be limited to 125 percent of what the Government had paid in the preceding year. It was his testimony that this restriction on a price increase of 25 percent over the preceding year’s price was designed to satisfy the Government’s objections to unlimited, and therefore inestimable, price escalation, and to give recognition at the same time to the plaintiff’s fears that the war situation would sky-rocket operating expenses, at least by 25 percent each year.
The testimony of these negotiators, which was not contradicted by the Government, constitutes clear and convincing evidence of a mutual mistake of the parties in failing to adequately express their agreement with respect to limiting price escalation. We therefore hold that the limiting clause must be reformed to express the parties’ intention that, by the language contained in article 6(p)e, the total.unit price *299 which, the Government would be required to pay for gas supplied by plaintiff during any fiscal year could not exceed 125 percent of the total unit price the Government had paid in the preceding fiscal year.
We have considered the defendant’s contention that laches bars the plaintiff’s claim for equitable relief from the mutual mistake of the parties, and we find that it is without merit. The controversy over the limiting clause first arose in 1948 when the Government asserted a claim to a refund of $2,£52.78. The plaintiff contested this claim, but the Government subsequently deducted the amount of the claim from the adjusted 'billing for the fiscal year ending June 80, 1950. The plaintiff thereafter diligently asserted its rights with respect to this and subsequent disallowances by appealing to the contracting officer and the Armed Services Board of Contract Appeals. It also attempted to secure relief under Title II of the First War Powers Act. After the Armed Services Board of Contract Appeals rejected plaintiff’s interpretation of the contract, and held that it was without jurisdiction to reform the contract, the plaintiff petitioned this court for relief. We can find nothing here to warrant our denying equitable relief.
The second issue in this case concerns the third count of plaintiff’s petition and involves the treatment of the expenses of plaintiff’s general manager and treasurer in determining plaintiff’s operating expenses for the base year 1940 and for subsequent contract years. In 1951, after both parties agreed that a mistake had been made in the allowance of certain costs for computing plaintiff’s operating expenses in the calendar year 1940 (the base year specified in article 6(p)b of the Supplemental Contract), the defendant’s auditor requested plaintiff to supply the records showing the expense accounts of plaintiff’s general manager and treasurer in order that the auditor might use the records in connection with his recomputation of operating costs for the calendar year 1940 and subsequent years. Plaintiff’s comptroller refused to supply the records, stating that they had been sent to New York and retained there and that no copies were available in Panama. Plaintiff’s comptroller also informed defendant’s auditor at the time that, even if the records were available, *300 the expenses were unrelated to the cost of manufacturing gas and would be excluded from operating costs. As a result, the defendant’s auditor took the following action:
At the time of redetermination of costs for the calendar year 1940 and subsequent fiscal years, an examination of all paid vouchers was made, with the exception of vouchers covering officer’s expense accounts. The General Manager of" Compañía Panameña de Fuerza y Luz, refused to produce for examination by the auditor, the vouchers covering the breakdown of the expenses included in such paid expense account vouchers, therefore, it was concluded that:
a. In redetermination of the calendar year 1940 costs there was no basis for disallowance of officer’s expenses under the Armed Services Procurement Regulations such expenses being an allowable item of cost, also the original contract contained no basis for determination of costs, therefore, they were allowed.
b. In redetermination of costs for the fiscal years 1943 thru 1953, under the supplemental agreement in which a basis for determination of costs is set out, and under which officer’s expense accounts are allowable items of cost, they were disallowed only for the reason that examination of paid expense account vouchers was refused the auditor.
Any reduction in the 1940 calendar year’s operating expenses resulted, under the terms of article 6(p)b of the supplemental contract, in an increase in the amount of the commodity clause adjustment in subsequent fiscal calendar years. In computing its supplemental bills and claims for all the years involved in this suit, plaintiff excluded the expenses of its general manager and treasurer for the calendar year 1940 in the amount of $987.30.
The books or vouchers listing the disputed expenditures of the general manager and treasurer were not offered in evidence by plaintiff, but there is testimony in the record showing that these expenses covered entertainment, club dues, and the like.
Paragraph h of article 6(p) required the contractor to render a statement showing the aggregate operating expenses for the base year 1940 for all gas produced and sold by the contractor during that year, the total number of units of gas produced and sold by the contractor during 1940, and *301 tbe average operating expenses per unit of gas produced and sold by the contractor during that year. Thereafter, at the close of each fiscal year under the contract, the contractor was required to render a like statement to the contracting officer for such fiscal year. Paragraph d of article 6(p) provided that “ [a] 11 statements rendered by contractor under paragraph a and b of the article shall be subject to the verification of an approval by the contracting officer.” The clear implication of paragraph d is that the Government had the right to check the books and vouchers of the plaintiff to determine whether the statements rendered by the plaintiff were proper and correct.
Under the Armed Services Procurement Eegulations[1] the expenses of the general manager and the treasurer might have been allowable expenses in determining operating costs. However, entertainment expenses are expressly unallowable.
The statements by plaintiff’s representatives to the contracting officer and at the trial before the trial commissioner that these expenses were for entertainment and were therefore not allowable does not satisfy the contract requirement that all statements rendered by the contractor shall be subject to the verification and approval of the contracting officer. The Government therefore had the right to treat these expenses as it did. Whatever inconsistencies there may have been in the Government’s treatment of these expenses of the general manager and the treasurer were due solely to the consistent refusal of the plaintiff to produce the records upon which approval and verification could have been based. It is no defense that the records had been sent to the plaintiff’s parent company in New York. The Government was dealing with the plaintiff and not with the parent company. The plaintiff is therefore not entitled to recover on the claim set out in the third count of its petition, and that count will be dismissed.
The trial before the trial commissioner was limited to the issues relating to the right of plaintiff to recover. Since we hold that the limiting clause must be reformed to express the intention of the parties, judgment will be entered for *302 plaintiff on Count II of its petition with the amount of recovery to be determined pursuant to Rule 38(c).
It is so ordered.
Littleton, Judge (Ret.); Laramore, Judge; Madden, Judge, and Whitaker, Judge, concur.
FINDINGS OE PACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, whose Spanish name is Compania Panameña de Fuerza y Luz, is a Florida corporation engaged in the business of selling utility services in the City of Panama, Eepublic of Panama.
2. Under date of June 80, 1938, plaintiff entered into a contract with the United States to supply manufactured gas to certain military establishments within the Panama Canal Zone. Said contract (hereinafter referred to as the 1938 Contract) was for a period of five fiscal years, due to expire on June 30, 1943, subject to the requirement that the United States specifically renew the contract prior to the close of each fiscal year.
3. Late in 1940 representatives of the Government approached plaintiff with a view to negotiating a renewal of the gas supply contract in considerably increased amounts due to the expansion of Canal Zone defense facilities. Plaintiff, however, stated that it had insufficient capacity to supply the increased needs and that it was unable to secure the necessary capital to expand its capacity. Plaintiff, therefore, proposed that defendant purchase its gas transmission and distribution lines within the Canal Zone in order to furnish plaintiff with a part of the funds necessary to defray the costs of expansion. Defendant agreed to this proposal.
4. Thereafter, under date of June 26, 1941, plaintiff and defendant entered into a contract supplementing the 1938 contract. The supplemental contract provided for the purchase by defendant of plaintiff’s gas distribution system in the Canal Zone for a specified sum and for the furnishing *303 of gas by plaintiff to a designated list of military installations within the Canal Zone in addition to the installations covered by the 1938 contract.
Article 6(r) of the supplemental contract provided that it was to remain in full force and effect until June 30,1941, but that it could be renewed annually at the option of the United States up to June 30, 1953, but no renewal was to include more than one fiscal year. The contract was duly renewed for the full period.
As of July 1, 1943, all military installations serviced by plaintiff in the Canal Zone were included under the terms of the supplemental contract and all gas was provided thereunder. The initial delivery of gas by plaintiff under the supplemental contract was not made until sometime during the fiscal year 1943.
5. For the fiscal years 1943 to 1953, the payments for gas supplied' to all military installations were to be made under the following provisions:
6(p) Rates: The United States shall pay contractor monthly for gas furnished at the following rates:
$1.60 net per unit for the first 3 units;
$1.50 net per unit for the next 17 units;
$1.15 net per unit for the next 30 units;
$1.00 net per unit for the next 700 units;
$0.95 net per unit for all over 750 units.
Monthly billings shall be rendered on the basis of the rates specified above, after deducting any credits accruing in its favor, as hereinafter provided. However, the total annual payments to the contractor for gas consumed during any fiscal year shall be subject to annual adjustment as follows:
a. Fuel oil. — At the close of each fiscal year, the contractor shall render a statement showing the average delivered cost per gallon of fuel oil consumed by it m the manufacture of gas during said fiscal year. The United States shall pay to the contractor a sum equivalent to 10 cents per unit of gas consumed by it during said fiscal year for each 1 cent, or fraction thereof, United States Currency, by which such average delivered cost exceeds 4 cents, United States Currency, per gallon of fuel oil.
b. For the purpose of this article, operating expenses are defined, as follows: Those items of operating expense specified in the Uniform, Bystem of Aceoimts, *304 effective January 1, 1940, as prescribed and published by the Federal Power Commission as “Operating Expense Accounts” under Titles I A. and C., II, III, and VI which by reference is made a part of this contract but excluding, however, therefrom all fuel oil expense, but including- however therein the amount of any taxes imposed by the United States or the Kepublic of Panama as are made applicable directly upon the production, manufacture, or sale of gas by contractor.
The rates specified above are subject to adjustment using the average operating expenses. per unit of gas produced and sold by contractor during the calendar year 1940 as a base. Contractor shall forthwith render a statement to contracting officer showing the following:
1. The aggregate operating expenses (as defined above) for the calendar year 1940 for all gas produced and sold by contractor during said year.
2. The total number of units of gas produced and sold by contractor during said year.
3. The average operating expenses per unit of gas produced and sold by contractor during said year. Hereafter, at the close of each fiscal year contractor shall forthwith render a like statement to contracting officer for such fiscal year. If there is a variation from the average operating expenses per unit of gas produced and sold by contractor for the calendar year 1940 of more than 10 per centum in the average operating expenses per unit of gas produced and sold by contractor for any such fiscal year, then the total annual payment made by the United States (that is, actual annual monthly payments plus any monthly credit offsets) shall be adjusted in the manner following:
1. If there is an increase in the average annual operating expenses per unit of gas produced and sold during any such fiscal year, then for each unit of gas consumed by the United States during such fiscal year, the United States shall pay to contractor the amount per unit (in dollars) by which such increase per unit exceeds 10 per centum of the average annual operating expenses per unit of gas produced and sold for the calendar year 1940.
2. If there is a decrease in the average annual operating expenses per unit of gas produced and sold during any such fiscal year, then for each unit of gas consumed by the United States during such fiscal year, contractor shall credit the United States the amount per unit (in dollars) by which such decrease per unit exceeds 10 per centum of the average annual operating expenses per unit of gas produced and sold for the calendar year 1940. *305 Any such credit shall be apportioned as an offset against the monthly billings for gas consumed by the United States during the succeeding fiscal year, or at contractor’s election such credit may be paid in a lump sum to the United States^ provided, that if the United States shall not exercise its option to renew this contract, or if any such credit accrues during the fiscal year ending in 1953, contractor shall pay such credit to the United States in one lump sum.
c. No adjustment either under a. or b. of this Article shall be made in respect of any gas furnished prior to the end of the month in which this supplemental contract is executed; neither shall any adjustment be made in respect of any gas furnished before June 30, 1943, to any of the United States Army or Navy activities designated in the said contract of June 30, 1938.
d. All statements rendered by contractor under para-Sraph a and b of the article shall be subject to the veri-cation of and approval by the contracting officer. All disputes concerning questions of fact arising under the contract shall be decided by the contracting officer, subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime, the contractor shall diligently proceed with performance.
e.In no event shall any annual adjustment m contractor’s favor under a and b above exceed 25 per centum of the average payment per each unit of gas made to the contractor during the preceding year. * * *
6. The foregoing contract provisions are designated herein by the same descriptive terms used by the parties. The rates in Article 6(p) are the base rates; Articles 6(p)a and 6(p)b, both of which are price escalation provisions are called the fuel oil and commodity clauses, respectively, while Article 6 (p) e is the limiting clause.
The principal controversy in this case involves the interpretation of the limiting clause as it affects the price payable by the Government for gas purchased in each fiscal year. Plaintiff interprets the limitation clause to mean that the total average price per unit, that is, the annual escalation adjustments under 6(p)a and 6(p)b (the fuel oil and commodity clauses), plus the average unit price paid under the monthly base rates, may not exceed the average payment *306 per unit of gas made during the preceding year by 25 percent. Defendant interprets the limiting clause to mean that the annual adjustments under 6(p)a and 6(p)b, the fuel oil and commodity clauses) may not exceed 25 percent of the average payment per unit of gas made during the preceding year. Plaintiff contends that its interpretation is in accord with the intention of parties at the time the contract was negotiated. Defendant disputes this.

Negotiation of the Supplemental Contract

7. The supplemental contract was negotiated in Washington, D.C., in the office of Col. Hugh B. Hester, Chief of the Procurement Control Branch, Planning and Control Division, Office of the Quartermaster General. The negotiations began late in 1940 or early in 1941 and were concluded a short time before the contract was signed. The War Department was represented in the negotiations by Col. Hester and Wendell S. Holmes, Chief Counsel for the Quartermaster General. The negotiators representing plaintiff were Hearne O. Adams of the Electric Bond and Share Company and John Kopelman, the head of the Bate Department of Ebasco Services, Inc., International Division. Plaintiff’s principal stockholder was the American and Foreign Power Company, and the Electric Bond and Share Company was the principal stockholder of both Ebasco Services, Inc. and the American Foreign Power Company. The first part of the negotiations covered the Government’s purchase of plaintiff’s facilities in the Canal Zone. Since plaintiff was to be obligated to supply gas under the renewed contract to the military installations in the Canal Zone for an additional period of 10 years at the option of defendant, plaintiff’s representatives insisted that the contract contain an escalation clause for the purpose of enabling plaintiff to recoup the increased costs which plaintiff felt certain it would incur during the period covered by the contract. The representatives of the War Department generally opposed contracts containing escalation provisions, but they were confronted with a need for increased utility services for expanding military operations in the Canal Zone and realized that the war situation made it impossible for the plaintiff *307 to assume the economic risk involved in a long-term contract without some degree of protection against the prospect of increased costs. While the defendant’s negotiators recognized the necessity for some type of escalation clause, they had to comply with the requirements of the law which prohibited the department from contracting for supplies or services unless there was an appropriation available for the payment of such obligations. Accordingly, the Government first proposed that the escalation be limited to a fixed amount to be stated in the contract. Tpjis position was reflected in a memorandum of April 11,1941, from Karl It. Bendetson, Major, J.A.G.D., to Heame O. Adams, stating:
1. Whether any contract which might ultimately be agreed to between your company and the War Department will or will not contain an Escalator Clause is a matter which has not yet been determined by the Secretary of War.
2. If a contract is ultimately executed and if such contract contains an Escalator Clause, the attached draft represents the personal views of Colonel Harry A. Auer as to what form such a clause should take. The draft may or may not represent the views of the Secretary of War in the matter.
The draft of Article 6(p)e, attached to the memorandum, stated in part:
In no event shall any total annual adjustment under a and h above exceed the sum of $_
The Government’s negotiators informed plaintiff’s representatives that the suggested limiting clause was based on the necessity of having a definite figure which could be used in preparing the department’s budget for submission to Congress each year. Plaintiff’s representatives refused to consider a lump-sum limitation on the ground that no one could foresee how long the war would last or what increases in the cost of labor and materials would occur during the term of the contract.
Plaintiff submitted a proposed draft of the supplemental contract to Col. Hester who, on May 6, 1941, returned it with a letter to Mr. Adams, stating that plaintiff’s draft was unacceptable for the reason that it would not sufficiently protect the interests of the Government. With the letter, *308 Col. Hester attached a draft of the proposed contract prepared by the Judge Advocate General’s Division. Clause 6(p)e of this draft contained the same language which is quoted above, and Article 6(p)f, as then proposed by the War Department, read:
f. Notwithstanding the provisions of clause p) above the rates upon which monthly billings shall be rendered shall in no case exceed the lowest rates charged within or without the Canal Zone.
Neither shall payments be made to contractor under the adjustment provisions of paragraphs a and 5 above in any sum which when added to the total monthly payments (that is, actual payments pirns credit offsets) made during the fiscal year would be in excess of the amount that would have been charged for the same quantity of gas at the lowest rates in effect in the Canal Zone or the Eepublic of Panama during the same period.
Plaintiff’s attorneys examined the War Department draft and on May 12, 1941, prepared a statement recommending changes, deletions, and additions to many of the provisions contained in the Army draft. With respect to Article 6 (p) e and 6(p)f, the statement of plaintiff’s attorneys was as follows:
Article 6(e). This provision should be deleted as there is no purpose whatever in attempting to place a ceiling on the amount of the adjustments to which the Company might be entitled. The contract should be examined from the standpoint of service at cost plus a fair return to the contractor on his investment. It is impossible to estimate the amount of any possible adjustment and there is no purpose in guessing thereat.
Article 6(f). This clause should likewise be deleted. The first paragraph would conflict with our existing arrangement in Panama whereby the Government enjoys certain discounts from the Company’s published tariff, while the second paragraph effectively nullifies any adjustment which the Company might otherwise receive under paragraphs (a) and (b).
8. After further negotiations, the parties agreed to and adopted Article 6(p)e of the supplemental contract. Two of the negotiators, Mr. Kopehnan who represented the plaintiff and Mr. Holmes who represented the defendant at the *309 time the limiting clause was agreed to, testified at the trial. Their testimony is in accord and shows the following:
(a) By the language contained in paragraph 6(p)e of the contract, the parties intended that the amount which the Government would be required to pay for gas supplied by plaintiff during any fiscal year (in terms of an average unit price) could not exceed 125 percent of the amount the Government had paid in the preceding fiscal year as a result of payments made under the base rates, billed and paid monthly, plus any annual adjustments allowed at the end of such preceding fiscal year;
(b) the language of the limiting clause satisfied the objection which the defendant had raised when the negotiations began because the costs were to be determined on a fiscal year basis and the defendant’s personnel who prepared the budget could compute the appropriation needed with reasonable precision by limiting the amount requested in the budget to 125 percent of the amount paid plaintiff during the preceding fiscal year. On the other hand, plaintiff was willing to assume the risk that its cost of producing and supplying a unit of gas in any one year would not increase by more than 25 percent of the cost during the previous year;
(c) there was no disagreement among the negotiators as to how the limiting clause would operate. They believed that the language contained in this clause expressed their intention and agreement;
(d) the negotiators for the plaintiff and defendant did not intend at the time the language of Article 6(p)e was adopted to write a limiting clause which reflected the interpretation which the defendant now places upon that clause.
Both witnesses testified that the words “any annual adjustment in contractor’s favor under a and 5 above” (Article 6 (p) e) meant the same to them as “total unit costs.”

The 1948 Dispute Over the Limiting Clause

9. During the fiscal years 1943 to 1947 inclusive, defendant paid plaintiff for the gas furnished pursuant to the supplemental oontract without any deductions or disallowances based on the limiting clause. However, on June 30, 1948, *310 plaintiff submitted a bill for $101,884.38 as the amount due for the annual adjustment under the fuel oil clause for the fiscal year 1948. After the defendant had paid the bill, it audited plaintiff’s books and records for the fiscal year 1948, and on August 11, 1948, the auditor requested the commanding general in the Canal Zone to obtain an opinion from the Judge Advocate as to the meaning of the words “preceding year” in the limiting clause and stated that if the words referred to the fiscal year ended June 30, 1948, there had been an overpayment to plaintiff of $19,780.19, whereas if the words referred to the year ended June 30,1947, the overpayment to plaintiff amounted to $2,852.78.
Thereafter, on September 14,1948, the commanding engineer submitted the following questions to the Judge Advocate’s office:
2. Clarification is requested of the words “immediately preceding fiscal year” as to whether it refers to the year 1 Jul 46 to 30 Jun 47 or to the year 1 Jul 47 to 30 Jun 48.
. 3. Further analysis of the problem reveals an additional question of interpretation of Paragraph e of Article VI of the supplemental agreement. For example: Reference is made to the figures in Exhibit “B” of Audit No. CC-5001-49. Question: Can paragraph e of Art. VI be interpreted to mean that with the assumption of the preceding fiscal year as the year ending 30 Jun 47, does the 25% allowed increase mean: adding $0.2916 to the $1.16642 average price per unit of gas for fiscal year 1947, arriving thereby at a total allowable annual average price of $1.45803 and comparing against that average price the fiscal year 1948 average price of $0.967027 plus $0.30 for fuel adjustment for a total of $1.267027 or a figure which is $0.19101 less than the average price for fiscal year 1947 plus 25 per centum added. Such an interpretation would indicate that no overpayment was made and would represent a third method of calculation not mentioned in the auditor’s report.
On October 13, 1948, the Judge Advocate rendered the following opinion:
a. In connection with the calculation of fuel oil adjustment for the fiscal year 1 July 1947 to 30 June 1948, it is my opinion that the words “preceding year” (as *311 used in the first sentence of Article 6 (p) e, page 7, of the supplemental contract dated 26 June 1941) refer to the fiscal year 1 July 1946 to 30 June 1947. The reasons upon which I base this opinion are as follows:
(1) The word “year” standing alone, obviously refers to a fiscal year inasmuch as to the contract term is a fiscal year; the adjustment is for a fiscal year and the only reference to a calendar year is to provision relative to 1940, which is simply used as a base year for figuring increase or decrease in operating costs (less fuel oil).
(2) If the intent of the parties was to base the limitation upon the payments made during the same fiscal year as the fiscal year for which adjustments (under paragraphs a and 5) were being calculated it is logical to assume that the word “preceding” would have been omitted.
(3) In paragraph I), the calculation concerning adjustment of costs, (excluding fuel oil) is for the same fiscal year as the calculation for fuel oil adjustment under paragraph a and, in providing for disposition of any credits due the united States, the term “succeeding year” is used, obviously referring to the fiscal year following the one for which the adjustment is calculated. (This comment also supports the contention in a above.)
(4) Taking for the norm, then the fiscal year being adjusted and noting the use of the terms “preceding year” and “succeeding year”, the parties could logically have intended to refer, respectively, to a fiscal year immediately following the year being adjusted.
(5) Apart from the desirability of having some ceiling in an excalator [sic] type of contract, I assume that for budgetary purposes the contracting officer would require some overall limitation on the contract containing adjustment clauses and, if so, that paragraph e was added, in part, to merit in this supposition, it appears reasonable to believe that the term “preceding year” was used because, at the time of reviewing the contract for a new fiscal year, the parties would know fairly accurately the average payment made during the then current year and the contracting officer could use this basis, plus a possible 25 % increase, in estimating budget requirements xor the new fiscal year. Thus, at the close of the new year the limitation applied on adjustments would be for the same year as the one upon which the budget estimate was calculated.
b. That the language of the agreement is ambiguous in this respect and that the construction of the questioned terminology is not entirely free from doubt must *312 be conceded. In attempting to arrive at the intention of the parties we have examined the files provided by your office and by the AG Depot; and have tried to locate any existing files in the QM office and G-4, ITSARCARIB. No record of correspondence has been found which provides background concerning the inclusion of the limitation clause in the contract. Your attention is invited to the fact that such a record may exist in the files of the contractor or the Department of the Army, and to the extent that it may reflect the intention of the parties, it could be determinative of this question. Also, if in any year in the past it has been necessary to apply the limitation, the conduct of the parties in applying it would be persuasive in arriving at the intent. In the absence of such aids to interpretation, the construction of the contract in light of its apparent purpose leads to the conclusion stated in paragraph la, above.
2. Relative to your inquiry paragraph 3, note 1: No. In my opinion the questioned limitation provision is not susceptible of the interpretation upon which your calculation is predicated.
10. On October 28,1948, the contracting officer wrote plaintiff, stating that in connection with the overpayment which the defendant had determined with respect to the fiscal year 1948, the office of the Judge Advocate had interpreted the words “during the preceding year” to refer to the fiscal year July 1, 1946 to June 30, 1947. The letter further stated that the opinion of the Judge Advocate had been accepted and that plaintiff was requested to forward its check in the amount of $2,852.78. This determination of the overpayment to plaintiff was made in accordance with defendant’s interpretation of the limiting clause in this action.
11. On November 2, 1948, H. L. Cory, a specialist in the Utility Contract Section of the Office of the Chief of Engineers, and the contracting officer met with plaintiff’s general manager and several other company officials in plaintiff’s office in the City of Panama. There was a discussion of a number of the matters relating to the gas supplied by plaintiff under the supplemental contract. At that time, Mr. Cory advanced the Government’s interpretation of the fuel oil clause, including the ceiling on that clause.
*313 No particular objection was raised to Mr. Cory’s interpretation, and there was apparent agreement that the Government’s interpretation of the fuel oil clause was correct. However, on November 9, 1948, plaintiff’s general manager wrote the contracting officer as follows:
Receipt is acknowledged of your letter of October 28, 1948 with regard to the matter of the Fuel Adjustment Clause of our gas supply contract.
It is not clear as to how any overpayment could result from the application of the clause quoted in the letter under reply and which is contained in Article 6(p) (e) of the Contract. It must be the position of the Caribbean Command that this clause has been misapplied. If such is the case, the Company is unable to concur with this conclusion.
The Escalator Clause was productive of a great deal of discussion at the time the Contract was under negotiation. The Army proposed a definite limit in terms of a specific amount to be agreed upon by the parties. The Company was unable to acquiesce in such proposal by reason of the obvious likelihood of increased costs which would be brought about by the war which was then being fought in Europe and in which the United States was soon to be involved. The Contract committed the Company for a period of 12 years and elementary considerations of business judgment made it impossible to accept such proposal.
The Army representatives, however, explained the necessity, in terms of budget requirements, of being able to estimate within fairly predictable limits the expense of gas procurement from year to year. In view of this situation the Company agreed to limit the price increase resulting from adjustment in any one year to not more than 25% of the cost during the preceding year. It was on this basis that the present language was agreed to.
If Paragraph (e) of Article 6(p) be interpreted in the manner suggested in your letter, the result thereof is to establish a maximum limit of adjustment which can never be exceeded. For example, the average base rate is approximately 960 per m.c.x. The first permitted adjustment is 240 so that the effective rate will be $1.20. In turn, a subsequent adjustment will be limited to 300 and the effective rate will become $1.26. Thereafter the adjustment will amount of 31.50 and the new rate will be $1,275. If this procedure be extended two more steps it will be seen that when the effective *314 rate reaches $1.28 no farther adjustment will be possible. Twenty-five percent of $1.28 is 320 and this will determine and [sic] identical $1.28 rate. This figure therefore becomes the maximum top limit.
The language of Article 6(e) must be construed in relation to the entire contract in order to give effect to the obvious intentions of the parties. The 25% limitation in the amount of the annual adjustment is in relation to the average payment per m.c.f. in the preceding year to the end that no increase of more than 25% could take place in any one year as compared with the overall unit price paid during the preceding year. It does not ?lace a ceiling on the price over the entire life of the ¡ontract in terms of the base rate. Any other interpretation would defeat the intention of the parties and result in inequity.
12. After the receipt of the foregoing letter, the contracting officer forwarded the matter to the Chief of Engineers by letter of November 30, 1948, reading as follows:
1.Reference is made to the contract for furnishing gas with the Compañía Panameña de Fuerza y Luz, and to the conferences which you attended on this matter in your recent visit to the Engineer Office of this Command.
2.The tentative agreement on the disputed matters, with the local company officials, has since been reconsidered by the company and their letter of 9 November, a copy of which is mclosed, places them in a position of being in direct dispute with the opinion of our Judge Advocate Office as to the interpretation of Article 6 (p) (e) of the contract. The company in effect has denied the correctness of the method used in arriving at the calculation for the annual fuel adjustment payment wherein the government states that it has made an overpayment of $2,852.78. The company denies that the government has made an overpayment and desires to interprétate paragraph (e) Article 6(p) of subject contract in a manner not acceptable to the government, in accordance with the interpretation of the Judge Advocate’s Office of this Command.
3.The local utility company is a subsidiary of the Electric Bond and Share Corporation, with offices in New York, and it is our understanding that it is the parent company that has over-ruled the tentative agreement reached locally in our first conference.
4.We are inclosing, as attachments, a copy of the contract, all recent correspondence on the subject, the *315 auditor’s recommendations, the request for reimbursement, and the company’s refusal.
5. In view of the foregoing facts, the location of the parent company, and the highly specialized aspect of this matter it is felt that all subsequent negotiations can best be handled by your office.
13. During February and March 1949, officials of Ebasco International Corporation had conferences with representatives of the Office of the Chief of Engineers regarding the disallowance. On June 30, 1950, defendant collected the $2,852.78 it had asserted as an overpayment by deducting that amount from plaintiff’s bill for the annual adjustment for the fiscal year 1950. By letter of July 26, 1950, to the contracting officer, plaintiff protested the deduction and requested that it be allowed 60 instead of 30 days in which to present the question again to the contracting officer. The extension was granted, and on August 8,1950, plaintiff filed its formal objections to the deduction, set forth its interpretation of the limiting clause, and requested that the dispute be referred to the Chief of Engineers.
14. On September 1, 1950, the contracting officer advised plaintiff that its only recourse for recovery of the amount deducted was the filing of a claim with the General Accounting Office. Thereafter, on November 21, 1950, and again during December 1950, officials of Ebasco International Corporation wrote the Office of the Chief of Engineers, outlining plaintiff’s views as to the proper interpretation of the limiting clause, requesting further consideration by the Chief of Engineers, and seeking his assistance in presenting the claim to the General Accounting Office.
On February 23,1951, the office of the Chief of Engineers replied to these requests by letter, which read in pertinent part as follows:
* * * it is the opinion of this office that the words “annual adjustment in contractor’s favor under a and i above,” as used in the above-quoted paragraph e, can only be interpreted as referring to the amount of the adjustment rather than to the adjusted price.
# >Jc * # #
The opinion of this office, therefore, confirms the interpretation placed upon the contract provisions by the contracting officer. If this method of settlement is un *316 acceptable, recourse may be bad in tbe preparation by your company of a claim to the General Accounting Office, Washington 25, D.C., for direct settlement.
15. After receiving the foregoing reply, a representative of Ebasco International Corporation requested information from the Chief of Engineers as to the procedure required for presenting plaintiff’s claim to the General Accounting Office and was advised that no particular form was needed.
The evidence does not establish that the plaintiff’s claim for the $2,852.18 was ever submitted to the General Accounting Office. However, as will hereinafter appear, plaintiff submitted claims to defendant on July 23, 1952, in the total sum of $76,614.28, which was asserted to be due under the provisions of the commodity clause of the supplemental contract in the period from December 8, 1941 through June 30, 1950. Plaintiff then stated that the amount of the claim included the sum of $2,852.78, which the defendant had deducted from plaintiff’s bill for the fiscal year 1950.

The 1951 Dispute Over the Commodity Clause

16. On June 30, 1951, plaintiff submitted supplemental bills to the defendant for an adjustment claimed to be due for the fiscal year ended June 30,1951, under the commodity clause (Article 6(p)b of the supplemental contract). On September 18, 1951, after an audit of plaintiff’s records, defendant advised plaintiff that it had disallowed certain expenses plaintiff had used in computing its operating expenses for the fiscal year 1951 under the commodity clause. The items eliminated and the reasons for the disallowance were as follows:
To eliminate from the basis for calculating, charges under Article 6 (b) 3, of the contract, that percentage of apporportional [sic] expenses apportioned to operating expenses for gas production which are considered unallowable under the cost principles as set forth in Armed Services Procurement Begulations. The following items of cost are disapproved: United States Federal Income Tax; Bepublic of Panama Income Tax; Contributions; Donations; Advertising other than Help Wanted and the personal expenses of the General Manager and Treasurer on which audit was denied. Cer *317 tain other -unallowable expenses, namely, Bad Debts; Customers Expenses and New Business Expenses have been eliminated in calculating costs under this Article over the entire period of the contract.
Contractor billing 205,806.7 Units @ 08.9511-$18,421. 96
Adjusted billing 205,806.7 Units @ 08.1459- 6,474.47
Disapproved_ 11,947.49
Plaintiff requested additional time to consider the disallow-ances and asked for a copy of the Armed Services Procurement Regulations, pursuant to which the costs referred to had been disallowed.
17. After receiving a copy of the regulations and after discussing the question with defendant’s auditor, the parties agreed that a mistake had been made in the allowance of certain costs in computing plaintiff’s operating expenses in prior years. However, since the disallowances had been applied by the Government’s auditor to the fiscal year 1951 only, plaintiff pointed out that the 1951 figures could not be adjusted without making a corresponding adjustment in plaintiff’s operating expenses for the calendar year 1940, the base year specified in Article 6 (p) b of the supplemental contract. Plaintiff’s position was set forth in a letter to the contracting officer on November 15, 1951, at which time plaintiff objected to the use of the Armed Services Procurement Regulations as a basis for determining costs, stated that plaintff had prepared a corrected set of figures based on the Uniform System of Accounts prescribed by the Federal Power Commission and referred to in the supplemental contract, and submitted a supplemental bill covering the fiscal year 1951 in the amount of $22,175.35, the additional amount due according to plaintiff’s computations for the fiscal year 1951.
18. During the period from January 11, 1952 through January 23, 1952, defendant’s auditor redetermined plaintiff’s average operating expenses per unit for the calendar year 1940, the base year referred to in the commodity clause of the supplemental contract, and as a result reduced such average operating costs from $0.542331, the figure formerly used, to $0.4607194. This reduction in the 1940 base year’s average operating expenses had the effect of increasing the *318 amount of adjustment due under the commodity clause in each of the subsequent fiscal years.
In connection with his redetermination, the auditor prepared a schedule in March 1952, showing the amounts that would be due plaintiff under the fuel oil clause, the commodity clause and the limiting clause for each of the fiscal years 1943 to 1951 inclusive, and this calculation resulted in increasing the amount of the commodity adjustment for the fiscal year 1951 from $24,548.62 to $35,744.12 in plaintiff’s favor. As stated above, plaintiff had submitted a revised bill for the fiscal year 1951 and was paid the additional amount due under the commodity clause for that year as determined in the auditor’s schedule. The schedule reflects the auditor’s determination that the limiting clause applied to the fiscal years 1944, 1948 and 1949, but not to 1951 nor to any of the other fiscal years covered by the auditor’s recalculations. Defendant did not collect any dis-allowances from plaintiff for the fiscal years 1944, 1948, and 1949 as a result of the auditor’s calculations that the limiting clause applied to those years, because plaintiff had not submitted any revised bills covering such years at that time. The schedule was made only in connection with plaintiff’s bill for the fiscal year 1951 which, as already stated, was duly paid. The date of payment is not shown in the record.
19. In preparing his schedule showing the effect of the revised operating costs for the calendar year 1940 on the amounts due for the fiscal years 1942 to 1951 inclusive, the auditor interpreted Article 6(p)e to mean that the anrma.1 adjustments under the fuel oil and commodity clauses in any one year could not exceed 25 percent of the preceding year’s average payment for each unit of gas sold during the preceding year. However, the method he used for applying his interpretation is shown by his calculations for 1944. He found the annual adjustment due under Article 6(p)a and b for that fiscal year to be the sum of $39,221.20. He then took 25 percent of the average payment per unit of gas sold in the fiscal year 1943 and multiplied the result by the total units of gas sold in 1943 and arrived at a figure of $27,098,99, which he considered to be the allowable amount *319 of the annual adjustment for the fiscal year 1944. Since he had previously found that the 1944 annual adjustment was $39,221.20 and that the maximum amount permitted under the limiting clause was $27,098.99, he determined that the difference of $12,122.21 was unallowable. As will hereinafter appear, the defendant’s auditor did not follow this accounting method in his determination of the amounts due plaintiff for the fiscal years 1952 and 1953.
20. On May 9, 1952, plaintiff submitted a revised bill for one of the fiscal years preceding the fiscal year 1951. On June 9, 1952, the bill was returned to plaintiff with the suggestion that any claim which it wished to make for adjustment fgr the years prior to the fiscal year ending June 30, 1951, be made on an overall basis from the effective date of the fuel oil and commodity clauses through June 30, 1950, taking into consideration the limiting clause. Accordingly, on July 23, 1952, plaintiff submitted to defendant revised bills totaling $76,614.26. Of this amount $74,361.48 represented plaintiff’s calculation of the additional amount due it under the commodity clause for the period from the effective date of the supplemental contract, December 8, 1941 through June 30, 1950, based on plaintiff’s recomputation of the average operating costs for the calendar year 1940. $2,842.78 of the bill represented defendant’s disallowance for the fiscal year 1948 on account of the application of the limiting clause. This disallowance was determined by defendant on October 28, 1948, and deducted by defendant on June 30, 1950, from the amount otherwise found to be due plaintiff for that fiscal year (findings 10 and 13).
21. Sometime after September 8,1952, (see findings under the heading “The 1952 Dispute Over the Limiting Clause”), the defendant’s auditor made a revised computation of the amount due plaintiff for the fiscal years 1943 through 1950, using a different accounting method than the one the auditor had used in preparing his schedule in March 1952. In the revised computations, the auditor found the amount due plaintiff for the fiscal years stated was the sum of $34,678.20, and this revised calculation was adopted and approved by the contracting officer sometime prior to November 11, 1953, *320 on which, date plaintiff wrote the contracting officer as follows with respect to the partial disallowance of plaintiff’s bills of July 23,1952:
Compania Panameña de Fuerza y Luz hereby expressly excepts to the action taken in relation to the partial disapproval of adjusted billing under the above contract for the years 1943 through 1950, inclusive.
This controversy is the same as the one in relation to the disallowances for the year 1952 as to which an appeal from your Finding of December 30,1952 is pending decision before the Armed Services Board of Contract Appeals.
A similar request for review as to disallowances for 1953 was filed with you on November 2, 1953 and the same issue is likewise presented.
For the reasons expressed in our presentation of November 2, 1953, it is our feeling that action on this case should also be deferred pending disposition of the pending appeal before the Armed Services Board of Contract Appeals as to the year 1952. Plowever, should you feel otherwise it is respectfully requested that an opportunity be afforded to present before you the evidence adduced before the Board as also to expound further as to the matter of inconsistent practices of the Audit Agency. With regard to the latter, please be advised that in relation to the 1952 case that certain interrogatories were submitted to Mr. John M. Kennedy and that the same, together with his answers, have been filed with the Armed Services Board of Contract Appeals. We request that a copy thereof be procured and that the same be made a part of the record in this case as also with respect to the request for review as to 1953. It is our feeling that any Finding which you may reach in that case and in the present one must necessarily deal with the factual situation disclosed by the answers given by Mr. Kennedy to the interrogatories referred to. The existence of the inconsistencies which we allege is, to our mind, clearly acknowledged but we cannot concur with the reasons which he adduces in an attempt to justify the same.
On November 19, 1953, the contracting officer replied by letter reading:
Receipt is acknowledged of your letter of November 11, 1953, wherein request was made that a copy of certain interrogatories, together with answers, be furnished. These interrogatories were propounded by the *321 Armed Services Board of Contract Appeals in connection with your appeal now before the Board from the findings of facts on adjusted billings on Contract No. W-61-qm-144 for the years 1943 through 1950.
The interrogatories and answers are now part of the Armed Services Board of Contract Appeals’ official record. Any action to obtain release of such record should be initiated by your company to the board itself.
22. The record does not show that any hearing was held or that further action was taken by the contracting officer with respect to the dispute regarding plaintiff’s revised bills totaling $76,614.26. However, in April 1955 (finding 26), plaintiff received a final payment of the amount which the defendant determined to be due plaintiff for the fiscal years 1943 through 1950.

The 195% Dispute Over the Limiting Clause

23. At the close of the fiscal year 1952, plaintiff submitted a bill for $121,140.86 for annual adjustments claimed for that year under the fuel oil and commodity clauses; the bill did not reflect any reduction by reason of the limiting clause.
In August 1952, defendant’s auditor determined that plaintiff was due the sum of $89,447.54 for that fiscal year and payment of that sum was made. The auditor used the same interpretation of the contract and the same accounting method as he had employed with respect to the fiscal year 1951, finding 19.
24. On September 8, 1952, plaintiff wrote the contracting officer, excepting to the disallowance of the annual adjustment claimed for the fiscal year ended June 30, 1952. The letter stated in part as follows:
The present position of the Army is somewhat different from the one taken in 1948. It is to the effect that the gross money payment during the preceding year determines the extent of the permitted adjustment in the following year. Thus, for example, the total amount paid in 1951 being $357,946.23, the permitted adjustment for 1952, it is claimed, may not exceed 25% of said amount or $89,486.54. The Company has not been informed as to the precise basis for this interpretation of the limiting clause. It would produce widely fluctuating results and this in itself is sufficient to refute it.
*322 Upon the receipt of plaintiff’s letter, defendant’s auditor reviewed his calculations and decided that he had made a mistake in the computations he had made in March 1952, (findings 18 and 19), in that he had multiplied the adjustment factor of 25 percent of the preceding year’s average payment per unit by the total number of units sold in the preceding year, whereas he should have taken 25 percent of the average payment for the preceding year and applied it to the total number of units sold to the defendant in the current year.
25. In order to correct his mistake and to compute the amount of the annual adjustment due plaintiff for the fiscal year 1952 under the changed accounting method, the defendant’s auditor reviewed all the computations he had made for the period from the inception of the contract through the fiscal year 1952. In so doing, he determined that
(a) the total annual adjustment claimed by plaintiff for 1952 should be reduced through application of the limiting clause by the sum of $33,875.92 or by $2,182.62 more than the auditor had decided in his August 1952 calculations. Since plaintiff had already been paid for 1952, the $2,182.62 was deducted from plaintiff’s bills in 1953 ;
(b) by reason of the application of the limiting clause to the total amiual adjustment claimed for the fiscal year 1951, a net credit of $11,949.85 was due the Government for that fiscal year;
(c) for the fiscal years 1943 through 1950 inclusive, the limiting clause was applicable only to the fiscal years 1948 and 1949 and that, after deductions of $33,402.57 on that account, there was a balance of $34,678.20 due plaintiff for the fiscal years 1943 through 1950.
26. The auditor’s revised computations were adopted by the defendant and, as a result, the $11,949.85, determined to be disallowable for the fiscal year 1951, was offset against the $34,678.20 which the auditor found to be due plaintiff for the fiscal years 1943 through 1950. The balance of $22,728.35 was paid at different times by the various military installations served by plaintiff, the last payment being received in April 1955.
27. The Army auditor’s recomputation for 1952 was ap *323 proved, and on December 31, 1952, the contracting officer issued his written decision and findings of fact in which the applicable provisions of the contract were quoted, and detailed computations showing the manner in which the annual adjustment for 1952 had been determined were set forth. The decision read in part as follows:
8. The contractor’s contention that the limiting clause (Article 6 (P) e) limits the amount the prior fiscal year cost may be increased rather than the amount the base rate may be adjusted is not tenable and the wording of the clause in dispute does not permit such interpretation. On 14 Sept 1948 a set of calculations incorporating what is now the contractor’s contention was presented by the Contracting Officer to the Judge Advocate for a legal interpretation of the wording of the clause. On 13 Oct 1948 the Judge Advocate stated “2. Relative to your inquiry paragraph 3, note 1: No. In my. opinion the questioned limitation provision is not susceptible of the interpretation upon which your calculation is predicated.”
$ ‡ $
(c) It is conceivable that if the contract had unlimited life, and costs continued to increase indefinitely the application of the limiting clause could cause an unfair hardship to the contractor. Under the terms of Article 6(r) annual renewal under the terms established in the supplemental agreement will terminate 30 June 1953. There is, therefore, no possibility that application of the limiting clause will cause undue hardship during the limited life of the contract.
10. Summary finding of fact:
a. Payment allowed under Sliding Scale Base rates for gas delivered during Fiscal Year 1952 _$267,351.67
b. Adjustment allowed under Article 6(P) a, b, e_ 87,264.94
c. Total payment allowed for gas delivered during Fiscal Year 1952_ 354,616. 61
d. The limiting clause applies to the adjustment of annual fiscal year charges.
e. Application of the limiting clause (Article 6(P) e) has not caused and will not cause undue hardship to the contractor during the life of the contract.
28. Plaintiff duly appealed from the decision of the contracting officer to the Armed Services Board of Contract Appeals.
*324 29. On August 26, 1953, while plaintiff’s appeal was pending, defendant sent plaintiff notice that its bill for the fiscal year 1953 had been disallowed to the extent of $4,201.57 by reason of the application of the limiting clause to the annual adjustment claimed for that year. By letter dated November 2, 1953, plaintiff notified the contracting officer that it excepted to the disallowance, called his attention to the appeal involving the 1952 annual adjustment, and requested that the contracting officer defer his decision on the 1953 claim until the appeal was decided. Plaintiff requested an opportunity to be heard in the event the contract-ting officer would not agree to defer his decision on the 1953 disallowance. On November 10, 1953, the contracting officer replied that the 1953 billing had been audited in accordance with the Army Audit Agency’s interpretation of the contract and that plaintiff’s pending appeal with respect to the fiscal year 1952 could not be considered in approving or disapproving plaintiff’s bill for the fiscal year 1953. There is no evidence that the contracting officer granted plaintiff a hearing or that he took any further action with respect to the 1953 disallowance.
30. On March 19,1954, the Armed Services Board of Contract Appeals issued its decision, which read in pertinent part as follows:
This is an appeal from the disallowance of $33,914.92 of the amount claimed by the appellant for gas delivered under the above contract to military installations in the Panama Canal Zone during the fiscal year 1952. ‡ ‡ ‡
The case is before this Board as the duly authorized representative of the Secretary of the Army in accordance with Article 6(p)d, which provides:
“* * * All disputes concerning questions of fact arising under the contract shall be decided by the contracting officer, subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto ^
Upon submission by the contractor of its charges for fiscal year 1952, the contracting officer disallowed a total of $33,914.92. Of this amount $39 is a deduction from the commodity adjustment under Article 6(p)b of the *325 contract, which, is not in controversy. The balance of $33,875.92 was deducted under Article 6(p)e. _ The contractor claims that the clause does not authorize the deduction. The contractingofficer determined that it does by his decision dated 31 December 1952, which was received by the contractor on 6 January 1953. A timely appeal was filed, receipt of which was acknowledged by the Government on 2 February 1953.
The sole question presented for our consideration is whether the deduction was properly made under Article 6 (p) e. The calculations in the Findings of Fact of the contracting officer are based upon a brief prepared by the Army Audit Agency. They may be summarized as follows:
Step 1. Adjustment íor FY 1952 under 6(p) a and b
a. Fuel ajustment (par a) per unit_$0. 30 total_$83, 004. 27
b. Commodity adjustment (par b) per unit_ . 137836 total_ 8,136. 59
c. Total . 437836 121,140. 86
Step 2. Average payment to contractor per unit for FY 1951
Total payment by Government_ Total units sold to Government_ $345, 996, 38 274, 252. 70 = $1. 261597 per unit
Step 3. 25% of $1.261597 (average payment per unit for FY 1951=$0.315399
Step 4. Determination of excess amount of adjustment
a. Total 1952 adjustment per Step 1_$0.437836
b. Less “25 per centum of tbe average payment per each unit of gas made to tbe contractor during” FY 1951 (per paragraph e)_ . 315399
. 122437
Step 5. Total excess=1952 consumption, 276,680.88 units X $0.122437=$33,875.92
The contractor challenges this method of computation, contending that consideration of the background and purpose of paragraph e requires the following interpretation :
“* * * If the base price, plus the unit price adjustments under the fuel and commodity clauses, do not exceed the adjusted price for the prior year by more than 25%, the limitation does not operate. The Company, in other words, gives full effect to the fuel and commodity adjustment clauses in the manner contemplated in the contract, and then checks the result against 125% of the previous year’s price.”
This would not affect the first three steps of the Government’s calculations set forth above. Substitute succeeding steps under the contractor’s theory, using the same figures, would be:
*326 Step 6. 125% of 1951 cost:
a. Adjusted 1951 cost_$345,996.38
b. 25% of a- 86,499.10
Total- 432,495.48
Step 7. Total 1952 cost:
a. Adjustment_ 121,140. 86
b. Allowed under base rates_ 267, 351.67
c. Total claim_._ 388,492.53
Step 8. Since the adjusted 1952 cost does not exceed 125% of the adjusted 1951 cost, no deduction is required under Article 6(p)e.
The contractor reaches its conclusion on the basis that the meaning of the paragraph is not clear. It relies upon the history, purpose and effect of the clause, and upon alleged inconsistencies in its application by the Government.
Decision
The question before us is whether the disallowance made, or any disallowance, is required by clause 6(p)e of the contract. The contractor’s claim is that the purpose and effect of that clause is to limit the total price of gas_ in any one year to 125% of the price paid the preceding year. This interpretation disregards the express language of the provision. The limitation is not upon the total price, but upon “any annual adjustment in contractor’s favor under a and 5” of Article 6(p). The amount of the adjustment for 1952 is determined by Step 1 of the above computations.
The measure of the limitation is clearly based upon the “average payment per each unit of gas made to the contractor during the proceeding [sic] year,” as shown in Step 2. Step 3 shows the amount of 25% of this average unit payment. Thereafter the contractor does not apply this measure to the current annual adjustment. It adds its money value to the full payment for the preceding year to determine 125% of that amount, as m Step 6, and uses the new sum as the limitation, not of the current adjustment but of the full current adjusted price. This is contrary to the clear meaning of the language used.
The contractor supports its interpretation by evidence of the original negotiations concerning this provision. This evidence is offered on the theory that the language of the clause as written is ambiguous. We find that it is not. It clearly states the method by which the adjustment is to be made. The Government has followed that method.
*327 Even if we should assume that there is an ambiguity in the language, it is nevertheless not susceptible of the interpretation placed upon it by the appellant. The original negotiations indicate that the purpose of the parties was to limit the annual price increase that might result from the effect of the escalator provisions of clauses 6(p) a and b. The company objected to an absolute monetary ceiling and a percentage arrangement was adopted. It specifically limits the increase in the unit rate, not in the total price.
It is pointed out that the base rates of the contract have resulted in an approximately constant unit cost of gas throughout the life of the contract. The imposition of a limit of increase of 25% of the preceding year’s price results in a steadily declining rate of increase. For practical purposes this results in a few years in a maximum ceiling on the rate of increase in the contract price. But this is still not the absolute money limit discussed in the negotiations. It is merely a limit upon the increase in the unit rate and not upon the total cost of gas.
Various alleged errors and inconsistencies of the Government are presented as indicating that it was unable to consistently interpret this clause. Their net effect is favorable to the appellant and they are not here in controversy except as evidence of alleged inconsistency. Since the parties are in agreement on the basic adjustments under paragraphs 6(p)a and 6(p)b any ambiguity that may have caused these errors and inconsistencies cannot be said to be pertinent to this case.
Considerable data has been presented to demonstrate the alleged equities and inequities of the Government’s calculations. As to them it is sufficient to say that this Board has no equitable jurisdiction and cannot reform the contract.
The appeal is accordingly denied.
31. Plaintiff timely filed a motion for rehearing, one paragraph of which read as follows:
Contractor is unable satisfactorily to construe the penultimate paragraph of the decision. The inconsistencies of the Government, contrary to what the paragraph says, are very much in controversy. There are two different concepts of inconsistency involved; the decision refers only to the different interpretations placed on the limiting clause by the Army. Apart from that inconsistency there is the further one of certain items of expense being allowed in computing 1940 unit *328 cost and of the same or substantially similar items being disallowed in subsequent years. Whatever the interpretation given the limiting clause, a finding is required on this point because it affects the money amount to which the Contractor is entitled quite apart from the limiting clause.
On July 16,1954, the Board denied the motion for rehearing in a decision which stated that the contracting officer’s decision and the appeal were concerned only with the limitation on the adjustment for the fiscal year 1952 and that no dispute regarding other matters or other years was before the Board.

The Dispute Regarding the 1940 Expense Accounts of Plaintiff's General Manager and Treasurer

32. In 1951, after both parties agreed that a mistake had been made in the allowance of certain costs for computing plaintiff’s operating expenses in the calendar year 1940 (the base year specified in Article 6(p)b of the supplemental contract), the defendant’s auditor requested plaintiff to supply the records showing the expense accounts of plaintiff’s general manager and treasurer in order that the auditor might use the records in connection with his recomputation of operating costs for the calendar year 1940 and subsequent years. Plaintiff’s comptroller refused to supply the records, stating that they had been sent to New York and retained there and that no copies were available in Panama. Plaintiff’s comptroller also informed defendant’s auditor at the time that, even if the records were available, the expenses were unrelated to the cost of manufacturing gas and would be excluded from operating costs. As a result, the defendant’s auditor took the following action:
At the time of redetermination of costs for the calendar year 1940 and subsequent fiscal years, an examination of all paid vouchers was made, with the exception of vouchers covering officer’s expense accounts. The General Manager of Compania Panameña de Fuerza y Luz, refused to produce for examination by the auditor, the vouchers covering the breakdown of the expenses included in such paid expense account vouchers, therefore, it was concluded that:
*329 a. In redetermination of the calendar year 1940 costs there was no basis for disallowance of officer’s expenses under the Armed Services Procurement Eegulations such expenses being an allowable item of cost, also the original contract contained no basis for determination of costs, therefore, they were allowed.
b. In redetermination of costs for the fiscal years 1943 thru 1953, under the supplemental agreement in which a basis for determination of costs is set out, and under which officer’s expense accounts are allowable items of cost, they were disallowed only for the reason that examination of paid expense account vouchers was refused the auditor.
33. As previously stated, any reduction in the 1940 calendar year’s operating expenses resulted, under the terms of Article 6(p)b of the supplemental contract, in an increase in the amount of the commodity clause adjustment in subsequent fiscal calendar years. In computing its supplemental bills and claims for all the years involved in this suit, plaintiff excluded the expenses of its general manager and treasurer for the calendar year 1940 in the amount of $987.30.
34. The books or vouchers listing the disputed expenditures of the general manager and treasurer were not offered in evidence by plaintiff, but there is testimony in the record to the effect that these expenses covered entertainment, club dues, and the like. In the Eepublic of Panama, it was expected that in view of the standing of plaintiff’s officials in the community, they would, to an extent left in their discretion, entertain Government officials, leading businessmen and others.

Plaintiff’s Applications For Belief Under Title II of the First War Powers Act

35. On June 29,1953, while plaintiff’s appeal from the 1952 disallowance was pending, plaintiff made a written application to the contracting officer for relief under Title II of the First War Powers Act. The application requested clarification and, if necessary, reformation of the first sentence of Article 6(p)e of the supplemental contract. On July 23, 1953, plaintiff’s application was returned without action by the Army Contract Adjustment Board because of *330 the fact that plaintiff’s appeal was then pending before the Armed Services Board of Contract Appeals.
By letter dated April 14, 1954, plaintiff requested another contracting officer to act on the application for relief previously filed with his predecessor. On April 15, 1954, the contracting officer wrote plaintiff that the action on its original application had been completed and was being returned to plaintiff for such further action as it desired to initiate.
36. On May 24, 1954, after plaintiff’s appeal had been decided adversely to it, plaintiff again wrote the contracting officer requesting that he act on its application for relief. The letter stated that the application had been returned by the Army Contract Adjustment Board only because of the appeal and that Army procedure required the contracting officer to act on such applications before they were considered by the Contract Adjustment Board. The contracting officer forwarded plaintiff’s application to the Army Contract Adjustment Board on May 26, 1954. On June 18, 1954, plaintiff was notified that its application for relief had been denied by the Board as a result of its determination that the national defense would not be facilitated by the granting of the application.

Trial Limited to Issues Affecting Liability

37. The trial was limited to the issues relating to the right of plaintiff to recover. If it is held that plaintiff is entitled to recover, the amount of the recovery is to be determined pursuant to Eule 38(c).
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover under Count II of its petition, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Eule 38(c).
It is further concluded that plaintiff is not entitled to recover on Counts I and III of its petition, and the petition as to those counts is dismissed.
*331 In accordance with, the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 17,1961, that judgment for plaintiff be entered for $77,084.35.

 The plaintiff makes no contention here that the Armed Services Procurement Eegulations are not applicable to the Supplemental Contract.