RAGONESE et al.

v.

UNITED STATES.

No. 49364.

United States Court of Claims.

May 4, 1954.

Nathan Patz, Baltimore, Md., for plaintiffs.

Donald D. Webster, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, and MADDEN, Judges.

WHITAKER, Judge.

On and after November 2, 1942, Frank P. Ragonese and Joseph V. Scaravelli were partners doing business as the Square Construction Company. The partnership will be hereafter referred to as the Square Construction Company, and for the purposes of this opinion will be treated as an entity. It sues for excess costs incurred by reason of encountering quantities of underground water, in the construction of a sewer under a contract with the defendant, in an amount which it says it had no reason to expect.

Plaintiff says, first that by reason of this it is entitled to an equitable adjustment under article 4 of the contract, because of an unknown condition; or, in the alternative, that it is entitled to its excess costs incurred on account of it, because the defendant concealed from it the existence of this water and thus prevented plaintiff from including in its bid an amount to take care of it.

1. As to whether or not plaintiff is entitled to an equitable adjustment under article 4 of the contract. Article 4, which refers to "Changed Conditions,"

provides that the contractor is entitled to an equitable adjustment if he "encounter[s], or the Government discover[s], during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications." Did the existence of this water materially differ from the subsurface conditions shown on the drawings or indicated in the specifications?

The defendant employed the Raymond Concrete Pile Company, Gow Division, to make 16 Gow test borings along the proposed sewer line. The plans and specifications set out the character of the soil disclosed by these borings, but said nothing one way or the other about subsurface water. It, therefore, cannot be said that the contractor encountered subsurface or latent conditions materially differing from those specifically shown on the drawings or indicated in the specifications.

It is true that the consulting engineers had made two borings with an earth auger along the proposed sewer line, and that in one of them they had encountered wet clay, but the consulting engineers had abandoned undertaking to make any further borings and had employed the Raymond Concrete Pile Company to ascertain the subsurface conditions. The drawings and specifications made no specific representation as to subsurface water discovered by the Raymond Concrete Pile Company. Since the borings made by this company were the borings which purported to show conditions along the sewer line, and since they did not indicate whether or not there was subsurface water, it cannot be said that the conditions encountered were different from those shown on the drawings or specifications.

However, article 4 further provides that if the contractor encounters "unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character pro-

vided for in the plans and specifications," then in that event the contractor is entitled to an equitable adjustment. Do the conditions encountered come within this clause of article 4?

The sewer line was 5,400 feet long. It commenced on the north with its junction with a sewer in Patapsco Avenue, in Baltimore, Maryland, and ran westerly about 360 feet; thence southerly about 2,750 feet; thence southwesterly approximately 1,400 feet; thence southerly about 370 feet; and thence westerly about 600 feet, where it joined a sewer at Curtis Avenue. Where the sewer line joined the Patapsco Avenue sewer it was less than 100 feet from an open body of water, known as Stonehouse Cove, which is an arm of Chesapeake Bay. For about one-half of its length it ran parallel with Stonehouse Cove and so close to it that when the tide was abnormally high, water from the cove overran about 200 feet of the route of the sewer.

The bottom of the sewer was from 20 to 45 feet below the surface of the ground, and for 4,800 feet of its total length of 5,400 feet it was below the level of the nearby sea. The only portion of it that was above sea level was the last 600 feet where the sewer turned westerly and ran uphill to Curtis Avenue.

The location of the sewer so close to Chesapeake Bay tends to indicate the probable presence of water in the line of the proposed sewer; but the proof shows that this is not necessarily so. Many times subsurface water is encountered where no body of surface water is nearby, and often it is not encountered when open water is nearby. Clay strata often interposes a wall which diverts water from its expected course.

However, the other three contractors who bid on this job expected to encounter water and included substantial sums in their bids to take care of it.

On the other hand, this plaintiff had constructed another sewer line in this general vicinity, at Wagner's Point, where it had encountered only a small

amount of subsurface water. This sewer line was only about 2,000 feet farther away from the Bay then the site of the one under consideration in this case.

Again, the defendant's report of the findings of the Raymond Concrete Pile Company on the borings made by them showed no subsurface water, whereas it is customarily shown by them when they encounter it, and this fact was well known to contractors, including plaintiff.

When these things are balanced one against the other, it is hard to say whether or not unusual conditions were encountered materially differing from those ordinarily encountered. It is true the consulting engineer and defendant's construction engineer found that such conditions had been encountered, and so wrote the contracting officer on January 29, 1944; but their finding was never approved by the contracting officer.

**2.** Although it is not easy to determine whether or not article 4 conditions were encountered, it is nevertheless true that defendant did withhold from plaintiff information in its possession which would have warned plaintiff that it was apt to encounter large quantities of excess water. The summary report of the Raymond Concrete Pile Company showed that in boring No. 1 a water level was reported at 9 feet below ground surface. As heretofore stated, the sewer line was from 20 to 45 feet below ground surface. In boring No. 3 a water level was reported at 10 feet below ground surface. In boring No. 7 a water level was reported at 7 feet 3 inches below ground surface. In boring No. 15 a water level was reported at 19 feet below ground surface, and in boring No. 16 a water level was reported at 12 feet 6 inches below ground surface. No water level was shown on the summary report for the other 11 borings, because when this company came to take the water level at these borings, the holes had caved in so that the water level could not be accurately measured. In driving many of the other 11 holes, however, subsurface water was encountered.

None of this information was furnished plaintiff. Had plaintiff had this information, that the water level in 5 of the 16 borings was much above the depth at which the sewer was to be laid, and had it been advised that water was encountered in many of the other 11 borings, but that the accurate water level at them could not be taken because the holes had caved in,[1] all of which information was in defendant's possession, it would have been put on notice that it probably would encounter large quantities of water above, and in some cases considerably above, the bottom of the sewer line.

Defendant not only did not furnish plaintiff with this information, but it said, in effect, that it did not have knowledge of the existence of this water, because it said that the information which it had furnished on subsurface conditions "represents the best information available."

Defendant undertakes to justify the withholding of this information on the ground that it was potentially misleading. It says that if it had told plaintiff that water had been discovered in 5 of the 16 borings, plaintiff would naturally have concluded that water had not been encountered in the other 11; but this is not true, because defendant could and should have also informed plaintiff that it could not give it accurate information relative to the water level on these other 11 holes because the holes had caved in, but that in driving a number of them water had been encountered.

We do not think it can be doubted that defendant did withhold from plaintiff material information, and that there was no justification for its doing so.

However, plaintiff has not made out a case unless it can show that the withhold-

1. The caving in of the 11 holes where the water level was not given would have warned plaintiff of the probable presence of water, although this would not necessarily be so.

ing of this information in fact misled it. If plaintiff should have known that it would encounter large quantities of water, although this information was withheld, then it cannot be said that it was misled.

There is a good deal in the record that tends to show that plaintiff should have known that it would have encountered water, as we have pointed out above, to wit, the close proximity of Chesapeake Bay, the fact that the bottom of the sewer was below sea level, that the last 600 feet of it ran uphill, indicating that the drainage was toward the sewer line, and the fact that the other bidders expected to encounter large quantities of water. On the other hand, we have the fact that plaintiff had constructed another sewer about 2,000 feet from the site of this present sewer, where it did not encounter large quantities of water, and the fact that it was known that the Raymond Concrete Pile Company, a firm of excellent reputation for accuracy, had made these borings, and that defendant had not reported that they had discovered any water, although the Pile Company was called on to report water if it did encounter it.

It is, therefore, difficult to say whether or not plaintiff should have expected to encounter large quantities of water. But plaintiff says that, in fact, it did not expect to, and we cannot say that this is untrue. Plaintiff, at least, had reasonable grounds to believe that it would not encounter excessive water. Certain it is, that if the defendant had furnished it with the information it had in its possession, it would have expected to encounter the water. This would have removed all doubt.

Since defendant was confessedly remiss in not having given plaintiff this information, and since the preponderance of the evidence shows that the withholding of this information did mislead plaintiff, we think it is entitled to recover the excess cost to which it was put by reason of the encountering of this water. The withholding of this information, especially in view of its representation that it had given bidders the best information available, was a breach of contract. See United States v. Atlantic Dredging Co., 253 U.S. 1, 9–11, 40 S.Ct. 423, 64 L.Ed. 735.

It might also be said that plaintiff's bid was between $65,000 and $70,000 below the next lowest bid, due in part to its omission to include items to care for large quantities of water. If the amount which we allow as damages for the withholding of this information be added to its bid, it is still $44,196.61 lower than the next lowest bid.

3. The amount which plaintiff is entitled to recover is not easy to determine.

Our best guide is the recommendation of the consulting engineers and the construction engineer of the Federal Works Agency, who, after investigating the situation, prepared a Change Order providing for an additional payment to plaintiff of $24,145.09. This amount was agreed to by plaintiff.

The sum was arrived at by including, *first*, the rental and freight for the well points which it was necessary for the contractor to use in the open trench section of the sewer to dispose of this water, the expense of the factory representatives superintending the installation and operation of these well points, the cost of their installation and operation, and the cost of maintenance and the pumping, plus a 6 percent allowance for overhead and profit, making a total of $13,141.19; and, *second*, the cost of removing the water from the tunnel sections by the use of compressed air. The removal of the water from the tunnels, in which portions of the sewer were laid, by compressed air required the installation of steel liner plates and grouting between them to make the tunnel more or less airtight. The total cost of the compressed air operation was $11,003.90, including 6 percent for overhead and profit. This did not include the excess cost of the steel liner plates over the timber provided for in

**772**

the specifications, which we think was proper, because plaintiff seems to have intended from the beginning to use steel liner plates in lieu of the timber, which was permitted by the specifications, but at no extra cost. It ordered these plates within a few days after the work started, and the contracting officer permitted the use of them with the understanding that no excess cost would be claimed.

The total recommended for allowance to cover the cost of the well points and the compressed air operation, plus overhead and profit, was $24,145.09.

However, although the construction engineer of the Federal Works Agency had joined in the recommendation of the issuance of Change Order No. 10, providing for an additional payment to plaintiff of $24,145.09, he sent in a report accompanying the Change Order, stating that plaintiff was probably entitled to only $12,881.63, instead of $24,145.09, which he had recommended. He arrived at this figure by reducing the amount allowed for the use of well points, and by eliminating altogether the allowance for the use of compressed air in the tunnels, except the item of $1,984.28 for grouting.

Why the construction engineer of the Federal Works Agency made these inconsistent recommendations is not explained. We are at a loss to understand why plaintiff would not be entitled to payment for the use of compressed air to eliminate the water in the tunnels if it was entitled to the cost of the well points to dispose of the water in the open trenches.

It seems to us that the recommendation of the consulting engineer for the payment of the amount stated in the Change Order of $24,145.09, originally concurred in by the construction engineer of the Federal Works Agency, and originally agreed to by plaintiff, comes about as near to the amount to which plaintiff is equitably entitled as any other figure suggested by the record.

Defendant takes the position that the findings of the contracting officer, affirmed on appeal, were final, but, if we assume that they are final on the question of plaintiff's right to an equitable adjustment under article 4,[2] they are certainly not final on the question of whether or not defendant breached its contract by withholding material information, and representing that the information furnished was the best available.

Defendant concedes that it is indebted to the plaintiff on the contract in the sum of $2,634.62. This is in addition to its liability for excess costs incurred due to the withholding of this information.

Judgment will be entered in favor of plaintiff in the sum of $26,779.71.

It is so ordered.

JONES, Chief Judge, and MADDEN, and LITTLETON, Judges, concur.

---

2. This is doubtful because neither the contracting officer nor the head of the department made findings of fact thereon.