**PANAMA POWER & LIGHT COMPANY**
v.
**UNITED STATES.**
No. 101–55.

United States Court of Claims.
June 8, 1960.

940

Raymond R. Billings, New York City, for plaintiff. Reid & Priest, New York City, were on the brief.

Gerson B. Kramer, Silver Springs, Md., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

Plaintiff is a Florida corporation engaged in the business of selling utility services in the City of Panamá, Republic of Panamá. This suit arises out of a contract for the sale of manufactured gas by the plaintiff to the armed forces within the Canal Zone. The primary issue here involves the operation of a limiting clause designed to restrict price escalation under the contract. If the limiting clause is deemed to be unambiguous and subject only to the Government's interpretation, the plaintiff requests that it be reformed by the court to correct a mutual mistake of the parties in failing to express their agreement in adequate form. The second issue involves the treatment of certain expense items in determining plaintiff's operating expenses in connection with the price escalation provision of the contract.

Under date of June 30, 1938, plaintiff entered into a contract with the United States to supply manufactured gas to certain military establishments within

the Panama Canal Zone. This contract (hereinafter referred to as the 1938 Contract) was to run for a period of five fiscal years, and was due to expire on June 30, 1943, subject to the requirement that the United States specifically renew the contract prior to the close of each fiscal year.

Late in 1940, representatives of the Government approached plaintiff with a view to negotiating a renewal of the gas supply contract in considerably increased amounts due to the expansion of Canal Zone defense facilities. Plaintiff stated that it had insufficient capacity to supply the increased needs and that it was unable to secure the necessary capital to expand its capacity. Plaintiff, therefore, proposed that defendant purchase its gas transmission and distribution lines within the Canal Zone in order to furnish plaintiff with a part of the funds necessary to defray the costs of expansion. Defendant agreed to this proposal.

Thereafter, under date of June 26, 1941, plaintiff and defendant entered into a contract supplementing the 1938 Contract. The Supplemental Contract provided for the purchase by defendant of plaintiff's gas distribution system in the Canal Zone for a specified sum, and for the furnishing of gas by plaintiff to a designated list of military installations within the Canal Zone, in addition to the installations covered by the 1938 Contract. Article 6(r) of the Supplemental Contract provided that it was to remain in full force and effect until June 30, 1941, but that it could be renewed annually at the option of the United States up to June 30, 1953. However, no renewal was to include more than one fiscal year. The contract was duly renewed for the full permissible period. As of July 1, 1943, all gas supplied to military installations serviced by plaintiff in the Canal Zone was provided under the terms of the Supplemental Contract. The initial delivery of gas by plaintiff under the Supplemental Contract was not made until sometime during the fiscal year 1943.

The first paragraph of article 6(p) of the Supplemental Contract set out base rates for each unit of gas. The unit was defined elsewhere as one MCF or 1,000 cubic feet of gas. Monthly billings were to be rendered on the basis of these base rates.

Because the plaintiff was to be obligated to supply gas under the Supplemental Contract to military installations for an additional 10 years at the option of the defendant, plaintiff's representatives insisted that the contract contain a price escalation clause for the purpose of enabling plaintiff to recoup the anticipated increased costs during the period covered by the contract. The representatives of the War Department were generally opposed to contracts containing price escalation provisions, but they were confronted with a need for increased utility services for expanding military operations in the Canal Zone, and realized that the war situation made it impossible for the plaintiff to assume the economic risk involved in a long-term contract without some degree of protection against the prospect of increased costs. Consequently, there was inserted in article 6(p) the provision that "the total annual payments to the contractor for gas consumed during any fiscal year shall be subject to annual adjustment * * *" which would reflect changes in the plaintiff's fuel oil and commodity costs.

The fuel oil cost adjustment agreed to became article 6(p)a of the contract (referred to herein as the "fuel oil clause"). It allowed a price adjustment of ten cents per MCF for each one cent or fraction thereof by which the cost of fuel oil might exceed four cents per gallon.

The parties' agreement on a commodity cost adjustment became article 6(p)b of the contract (referred to herein as the "commodity clause"). This commodity clause provided for a price adjustment in the event of an increase in average MCF operating expenses (excluding fuel oil costs) in any fiscal year over such expenses in the base year (the calen-

dar year 1940). All increases in excess of 10 percent over the base year average MCF operating expenses were reimbursable to plaintiff, and any decrease in excess of 10 percent was to be credited to the United States.

While the defendant's representatives recognized the necessity for some type of price escalation clause, they had to comply with the requirements of the law which prohibited the War Department from contracting for supplies or services unless there was an appropriation available for the payment of such obligations. The need for an appropriation called for the ability to estimate the dollar cost of its requirements. Accordingly, the Government first proposed that the price escalation be limited to a fixed dollar amount to be stated in the contract. The Government's negotiators informed plaintiff's representatives that the suggested limiting clause was based on the necessity of having a definite figure which could be used in preparing the department's budget for submission to the Congress each year. Plaintiff's representatives refused to consider a lump-sum limitation on the ground that no one could foresee how long the war would last or what increases in the cost of labor and materials would occur during the term of the contract. After submitting further drafts of proposed limitations on price escalation, and after further negotiations, the parties agreed to and adopted article 6(p)e (referred to herein as the "limiting clause") of the Supplemental Contract, which provided in pertinent part as follows:

> "In no event shall any annual adjustment *in contractor's favor* under *a* and *b* above exceed 25 per centum of the average payment per each unit of gas made to the contractor during the preceding year. * * *"
> (Emphasis supplied by the contracting parties.)

The principal controversy in this case involves the interpretation of this limiting clause as it affects the price payable by the Government for gas purchased in each fiscal year.

The Government first takes the position that the "annual adjustment *in contractor's favor* under *a* [the fuel clause] and *b* [the commodity clause]" refers to the payment which reflected increased fuel oil and commodity costs, as distinct from the monthly payments, which reflected only the base rates. It then interprets the limiting clause to mean that in no event shall any annual adjustment in contractor's favor under article 6(p)a and article 6(p)b (the fuel oil and commodity clauses) exceed 25 percent of the average payment per each unit of gas made to the contractor during the preceding year

Under the Government's interpretation the maximum permissible average unit price in any year is the average payment per unit under the base rates plus the amount of annual adjustment (25 percent of the average payment per each unit of gas made to the contractor during the *preceding* year). Since the average payment per unit under the base rates fluctuated only slightly, the Government's formula results in a maximum permissible increase over the base rates of 25 percent in the first year of operation under the contract. But the increase in the second year would be limited to the sum of the first year's increase plus 25 percent of the first year's increase. In the third year the increase would be limited to this second year's increase plus 25 percent of the second year's increase. The *rate* of increase would diminish so rapidly that, as a practical matter, there could be no further price escalation after the fourth year. And the maximum increase or adjustment could never exceed approximately 33⅓ percent of the base rates during the entire ten-year life of the contract.

It is plaintiff's position that, by the language contained in the limiting clause, the parties intended that the average payment per each unit of gas made to the contractor by the Government during any year could not exceed 125 percent of the average payment in the preceding year. The phrase "aver-

age payment per each unit of gas" in this context reflects the monthly payments under the base rates plus the annual adjustment in any one year in terms of an average unit price.

The Government objects to this interpretation on the ground that provision for a 125 percent permissible increase in the average unit price each year could be read into the contract only if the limiting clause is rephrased to read:

> "In no event shall * * * [the average payment per each unit of gas made to the contractor in the year under adjustment]. exceed [by] 25 per centum * * * the average payment per each unit of gas made to the contractor during the preceding year."

Or, in the alternative:

> "In no event shall * * * [the average payment per each unit of gas made to the contractor in the year under adjustment] exceed * * * [125] per centum of the average payment per each unit of gas made to the contractor during the preceding year."

Although the rephrasing suggested by the Government would accomplish the result urged by the plaintiff, it constitutes something more than interpretation.

The plaintiff, however, denies that this rephrasing is necessary. On the contrary, it takes the position that the limiting clause is ambiguous. It contends that the words "annual adjustment," *per se*, have no exact connotation, but that "they cannot be deemed inappropriate" to express the concept of a revision or adjustment of the price in the *preceding* year. If this is what "annual adjustment" means, the limiting clause does not on its face contain the complete formula or scheme for determining maximum permissible price escalation. According to plaintiff, the specified percentage (25 percent) of the prior year's average unit price is not in itself the maximum annual adjustment, but only a

*factor* in the determination of the maximum annual adjustment. The limiting clause, so the argument runs, thus provides a 25 percent factor, but is silent as to the manner of its application. Since the contract fails to spell out the next step, the plaintiff, relying on the intention of the parties, takes this 25 percent factor and adds it to the previous year's average unit price in order to determine the maximum permissible unit price for the year for which an increase in rates is sought. If the base rate component plus the amounts produced by the price escalation clauses in the year for which the increase is sought does not exceed this figure (i. e., the *25 percent factor* added to the *previous* year's average unit price) the increase under the price escalation clauses is allowable.

We cannot say, from a reading of the entire contract, that the limiting clause is subject only to the interpretation offered by either party. The Army itself changed its position on the interpretation of the limiting clause after the dispute over the application of the limiting clause arose. However, we believe that the language does favor the Government's interpretation. Therefore plaintiff is not entitled to recover on Count I and its petition as to that count will be dismissed.

While it may be true that the words "annual adjustment" have no exact connotation if taken alone, they do not stand alone in the contract. The first paragraph of article 6(p) provides that:

> "Monthly billings shall be rendered on the basis of the rates specified above [referring to the base rates] * * *. However, the *total annual payments* to the contractor for gas consumed during any fiscal year shall be *subject* to *annual adjustment* as follows:" (Emphasis supplied.)

Used in this context the words "annual adjustment" would appear to refer to an adjustment of the payments in the year for which the increase in rates is sought, and not necessarily to an adjustment of

the average unit price paid in the *preceding* year.

In the limiting clause itself, the words "annual adjustment" do not stand alone, but are modified by the phrase *"in contractor's favor* under *a* and *b* above." This is susceptible to the interpretation that "annual adjustment" refers to the average unit price paid under the fuel oil and commodity clauses, as distinct from, and in addition to, the average unit price paid under the base rates.

■ Even though we might be persuaded that, as between these two conflicting interpretations, the language favors the Government's interpretation, we do not believe that the plaintiff's interpretation is completely without merit. But regardless of which interpretation appears to be correct, we believe that the plaintiff's request in Count II of its petition that the court correct a mutual mistake of the parties in failing to express their agreement in adequate form should be granted. It is not questioned that this court has equitable jurisdiction to reform a written instrument as part of its general power to render a money judgment. Olympia Shipping Corp. v. United States, 1930, 71 Ct.Cl. 251.

We have carefully studied the record, particularly the testimony of those witnesses who had a hand in negotiating and drafting the Supplemental Contract, and we are forced to conclude that the plaintiff has made out a strong, if not overwhelming, case for reformation. One of the chief negotiators for the plaintiff testified that it was the intention of both parties that the plaintiff could increase its rates so as to recoup increases in the cost of fuel oil and increased operating expenses, but that the limiting clause was put in the contract, at the Government's insistence, to restrict total unit price to the Government to 25 percent over the total unit price paid in the preceding year.

Of more importance is the testimony of the Government's chief negotiator. He stated emphatically that it was the intention of the Government in agreeing to the limiting clause that the maximum total unit price in any one year would be limited to 125 percent of what the Government had paid in the preceding year. It was his testimony that this restriction on a price increase of 25 percent over the preceding year's price was designed to satisfy the Government's objections to unlimited, and therefore inestimable, price escalation, and to give recognition at the same time to the plaintiff's fears that the war situation would sky-rocket operating expenses, at least by 25 percent each year.

■■ The testimony of these negotiators, which was not contradicted by the Government, constitutes clear and convincing evidence of a mutual mistake of the parties in failing to adequately express their agreement with respect to limiting price escalation. We therefore hold that the limiting clause must be reformed to express the parties' intention that, by the language contained in article 6(p)e, the total unit price which the Government would be required to pay for gas supplied by plaintiff during any fiscal year could not exceed 125 percent of the total unit price the Government had paid in the preceding fiscal year.

■ We have considered the defendant's contention that laches bars the plaintiff's claim for equitable relief from the mutual mistake of the parties, and we find that it is without merit. The controversy over the limiting clause first arose in 1948 when the Government asserted a claim to a refund of $2,852.78. The plaintiff contested this claim, but the Government subsequently deducted the amount of the claim from the adjusted billing for the fiscal year ending June 30, 1950. The plaintiff thereafter diligently asserted its rights with respect to this and subsequent disallowances by appealing to the contracting officer and the Armed Services Board of Contract Appeals. It also attempted to secure relief under Title II of the First War Powers Act, 50 U.S.C.A.Appendix, § 611. After the Armed Services Board of Contract Appeals rejected plaintiff's interpretation of the contract, and held that it was

without jurisdiction to reform the contract, the plaintiff petitioned this court for relief. We can find nothing here to warrant our denying equitable relief.

■ The second issue in this case concerns the third count of plaintiff's petition and involves the treatment of the expenses of plaintiff's general manager and treasurer in determining plaintiff's operating expenses for the base year 1940 and for subsequent contract years. In 1951, after both parties agreed that a mistake had been made in the allowance of certain costs for computing plaintiff's operating expenses in the calendar year 1940 (the base year specified in article 6(p)b of the Supplemental Contract), the defendant's auditor requested plaintiff to supply the records showing the expense accounts of plaintiff's general manager and treasurer in order that the auditor might use the records in connection with his recomputation of operating costs for the calendar year 1940 and subsequent years. Plaintiff's comptroller refused to supply the records, stating that they had been sent to New York and retained there and that no copies were available in Panamá. Plaintiff's comptroller also informed defendant's auditor at the time that, even if the records were available, the expenses were unrelated to the cost of manufacturing gas and would be excluded from operating costs. As a result, the defendant's auditor took the following action:

"At the time of redetermination of costs for the calendar year 1940 and subsequent fiscal years, an examination of all paid vouchers was made, with the exception of vouchers covering officer's expense accounts. The General Manager of Compania Panamena de Fuerza y Luz, refused to produce for examination by the auditor, the vouchers covering the breakdown of the expenses included in such paid expense account vouchers, therefore, it was concluded that:

"a. In redetermination of the calendar year 1940 costs there was no basis for disallowance of officer's expenses under the Armed Services Procurement Regulations such expenses being an allowable item of cost, also the original contract contained no basis for determination of costs, therefore, they were allowed.

"b. In redetermination of costs for the fiscal years 1943 thru 1953, under the supplemental agreement in which a basis for determination of costs is set out, and under which officer's expense accounts are allowable items of cost, they were disallowed only for the reason that examination of paid expense account vouchers was refused the auditor."

Any reduction in the 1940 calendar year's operating expenses resulted, under the terms of article 6(p)b of the supplemental contract, in an increase in the amount of the commodity clause adjustment in subsequent fiscal calendar years. In computing its supplemental bills and claims for all the years involved in this suit, plaintiff excluded the expenses of its general manager and treasurer for the calendar year 1940 in the amount of $987.30.

The books or vouchers listing and the disputed expenditures of the general manager and treasurer were not offered in evidence by plaintiff, but there is testimony in the record showing that these expenses covered entertainment, club dues, and the like.

Paragraph *b* of article 6(p) required the contractor to render a statement showing the aggregate operating expenses for the base year 1940 for all gas produced and sold by the contractor during that year, the total number of units of gas produced and sold by the contractor during 1940, and the average operating expenses per unit of gas produced and sold by the contractor during that year. Thereafter, at the close of each fiscal year under the contract, the contractor was required to render a like statement to the contracting officer for such fiscal year. Paragraph *d* of article 6(p) provided that "[a]ll statements rendered

by contractor under paragraph *a* and *b* of the article shall be subject to the verification of an approval by the contracting officer." The clear implication of paragraph *d* is that the Government had the right to check the books and vouchers of the plaintiff to determine whether the statements rendered by the plaintiff were proper and correct.

Under the Armed Services Procurement Regulations [1] the expenses of the general manager and the treasurer might have been allowable expenses in determining operating costs. However, entertainment expenses are expressly unallowable.

The statements by plaintiff's representatives to the contracting officer and at the trial before the trial commissioner that these expenses were for entertainment and were therefore not allowable does not satisfy the contract requirement that all statements rendered by the contractor shall be subject to the verification and approval of the contracting officer. The Government therefore had the right to treat these expenses as it did. Whatever inconsistencies there may have been in the Government's treatment of these expenses of the general manager and the treasurer were due solely to the consistent refusal of the plaintiff to produce the records upon which approval and verification could have been based. It is no defense that the records had been sent to the plaintiff's parent company in New York. The Government was dealing with the plaintiff and not with the parent company. The plaintiff is therefore not entitled to recover on the claim set out in the third count of its petition, and that count will be dismissed.

The trial before the trial commissioner was limited to the issues relating to the right of plaintiff to recover. Since we hold that the limiting clause must be reformed to express the intention of the parties, judgment will be entered for plaintiff on Count II of its petition with

the amount of recovery to be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

LITTLETON, Judge (Retired), and LARAMORE, MADDEN and WHITAKER, Judges, concur.

---

[1]. The plaintiff makes no contention here that the Armed Services Procurement Regulations are not applicable to the Supplemental Contract.