**EVANS REAMER & MACHINE COMPANY**

v.

**The UNITED STATES.**

No. 434–59.

United States Court of Claims.

Nov. 9, 1967.

Certiorari Denied March 11, 1968.

See 88 S.Ct. 1102.

Victor Strimbu, Jr., Cleveland, Ohio, for plaintiff. Herbert A. Spring, Cleveland, Ohio, attorney of record. Richard F. Stevens, Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel.

James A. Pemberton, Jr., with whom was Acting Asst. Atty. Gen. Carl Eardley, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COL-

LINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on October 21, 1966. Exceptions to the commissioner's opinion and report were filed by plaintiff and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner's findings, opinion, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER**

FLETCHER, Commissioner:

In 1952 the Office of Defense Mobilization issued Defense Manpower Policy No. 4 (DMP–4) which had as its purpose:

> * * * procurement by negotiated contracts and purchases with responsible concerns which are in an area of current or imminent labor surplus * * * in cases where the public interest dictates the need for doing so * * *[1]

Under this policy a system of so-called "set-asides" was introduced into Government procurement practice. A typical procurement would be split into two segments with a portion of the total purchase being awarded to the lowest responsible bidder, wherever located, and with the remainder being "set-aside" for negotiation with firms located in labor surplus areas. Although, originally, procuring agencies were authorized in such procurements to pay price differentials (see 31 Comp.Gen. 279), by November 1953 the policy had changed to the end that the contract price for the "set-aside" could not exceed the award price for the bid, or non-set-aside, portion of the procurement.[2]

The contract in dispute here arose out of such a "set-aside" procurement. During 1953 the Army Chemical Corps had designed and developed a new type of fire bomb for use by the Air Force. The casing for this bomb was made primarily of aluminum and resembled a cigar in shape with a length of 11 feet and a diameter of 18 inches. It was designed to contain 650 pounds of napalm, a jellied gasoline which will burn at high temperatures when ignited and is very difficult to extinguish.

The Chemical Corps assigned procurement responsibility for the fire bomb to its New York Chemical Procurement District. On May 14, 1954, the Procurement District issued its Invitation For Bids for the manufacture and supply of 73,944 fire bombs on the basis of both F.O.B. origin and F.O.B. destination. The invitation contained a note indicating that a "set-aside" procurement might be negotiated with firms located in labor surplus areas in accordance with pertinent

---

* The dissenting opinon of NICHOLS, Judge, follows the opinion of the Trial Commissioner which has been adopted by the Court.

** The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

[1]. Undated mimeographed release from Office of Defense Mobilization, p. 1 (ODM–3560). See the Appendix hereto where Defense Manpower Policy No. 4 and relevant statutes and regulations are reproduced for convenient reference.

[2]. 18 Fed.Reg. 6995 (1953). Section 644 of the Department of Defense Appropriation Act of 1954 provided that no appropriated funds could be used to pay a price differential on contracts made for the purpose of relieving economic dislocations. P.L. 179, 83d Cong., 1st Sess., approved August 1, 1953, 67 Stat. 357 (1953). The same proviso was continued in Section 733 of the Department of Defense Appropriation Act of 1955. P.L. 458, 83d Cong., 2d Sess., approved June 30, 1954, 68 Stat. 356 (1954). See Appendix hereto.

provisions of the Armed Services Procurement Regulations (ASPR). Any bidder desiring to participate in such negotiations was invited to attach to its bid on the non-set-aside portion of the procurement a supplemental letter furnishing data as to its eligibility to negotiate for the potential set-aside portion.

The plaintiff, Evans Reamer & Machine Company (Evans), was one of more than 50 bidders who responded to the IFB. Its manufacturing plant was located in Perry County, Ohio, a coal mining area where chronic unemployment had existed for many years. Accordingly, Evans attached to its competitive bid a statement indicating its interest in, and eligibility for, negotiations on any set-aside portion of the fire bomb procurement.[3]

The bids were opened at the Procurement District's offices on June 15, 1954. The low bidder, by reason of an apparent mistake, was allowed to withdraw its bid. The next lowest bid was submitted by The Aircraftsmen Company (Aircraftsmen) at $73.98 per bomb, F.O.B. origin. Following, in order, were the bids of Evans' parent company, Lempco Products, Inc. (Lempco) at $87.40 F.O.B. origin, and of Evans itself at $87.65 F.O.B. origin.[4]

Defendant's contracting officer immediately dispatched pre-award survey teams to Aircraftsmen and Lempco for the purpose of ascertaining their respective manufacturing and financial capabilities. Favorable survey reports were furnished by both teams. However, the survey team at Aircraftsmen discovered that, due to a mistake, Aircraftsmen's bid was $2.056 per bomb lower than it should have been. Notwithstanding, Aircraftsmen asked that it be awarded the contract at its erroneous bid price upon the mutual understanding that it would process a mistake-in-bid claim to the General Accounting Office (GAO) seeking a price increase of $2.056 per bomb.

The contract for the non-set-aside portion of the procurement was awarded to Aircraftsmen in late June 1954. It called for the manufacture and delivery of 73,944 fire bombs at a delivery rate (after the first two months of production) of 8,000 bombs per month. The original contract prices per bomb were $73.98 and $77.78 F.O.B. origin and destination, respectively, but when, in October, GAO approved Aircraftsmen's mistake-in-bid claim, those prices were increased, in keeping with the Procurement District's prior commitment, by $2.056 per bomb.

Meanwhile, it had developed that Evans was the only bidder who was eligible to negotiate for a set-aside procurement of the fire bombs.[5] A survey team dispatched to Evans' plant by the contracting officer reported favorably on Evans' financial and technical capacity to perform, subject to its obtaining a guarantee of financial support from its parent, Lempco. Thereupon, the contracting officer sent a letter to Evans under date of July 20, 1954, inviting Evans to quote on a set-aside quantity of 71,661 bombs with monthly deliveries commencing in April 1955. He referred specifically to ASPR 1–302.4 providing that set-aside procurements could be negotiated at prices no higher than those paid on the non-set-aside portion, and advised Evans that the award under the

3. As of the time Evans submitted its bid, Perry County had not been formally classified by the Department of Labor as a so-called Group IV Area of Labor Surplus. However, Evans' application for such classification was then pending and on June 24, 1954, the Department of Labor formally classified Perry County as a Group IV area.

4. The Government had estimated the cost of producing these fire bombs at $125 per bomb.

5. As required by ASPR 3–219.3, Evans' bid was within 120 percent of Aircraftsmen's low bid, and by the time of award to Aircraftsmen, the area of Evans' manufacturing facilities had been officially classified as a labor surplus area. See footnote 3, supra.

non-set-aside portion had been made at $73.98 per bomb F.O.B. origin.

By return mail, Evans rejected "the opportunity of taking on" the set-aside because its basic manufacturing costs would exceed the proposed set-aside price of $73.98 and because, in addition, there was a strong probability of substantial increases in aluminum prices during the production period. Thereupon, the contracting officer consulted his commanding officer regarding further action on the procurement assignment. The latter decided that inquiry should be made of Evans as to whether it would be interested in negotiations if the maximum price were set at $76.036 on the assumption that Aircraftsmen's claim before GAO for an increase of $2.056 would be successful. The contracting officer immediately made such an inquiry of Evans' representatives by telephone but was told that Evans could not meet the $76.036 price either. In the belief that negotiations with Evans had thus terminated, the contracting officer commenced action leading to the issuance of another Invitation For Bids on the remaining quantity of fire bombs.[6]

A few days later Evans' chief negotiator reconsidered the matter and concluded that his rejection of the $76.036 price had been premature. He telephoned the contracting officer to advise him that Evans was interested in negotiating for the set-aside portion of the fire bomb procurement at any price allowed Aircraftsmen in excess of the $73.98 price. This advice was confirmed by telegrams and letters. Also, Evans' chief negotiator had a personal conference on the matter with the Commanding General, Army Chemical Corps, Materiel Command (MATCOM), which visit resulted in an order to the contracting officer to forward the file for appellate review by MATCOM.

In a letter to the contracting officer dated August 23, 1954, Evans had forwarded a cost breakdown and stated its willingness to accept a contract for the set-aside quantity of fire bombs at the Aircraftsmen's price of $73.98 subject to an increase of $2.056 if Aircraftsmen's claim to GAO were successful. The contracting officer forwarded the letter to MATCOM where the matter was under review.

At this point, a change in the delivery schedule set forth in the non-set-aside contract (8,000 bombs per month) was imported into the correspondence. Under instructions from MATCOM, the contracting officer on August 26 inquired of Evans whether the same "terms and conditions" contained in its letter of August 23 would apply to a production rate of 3,000 bombs per month. Evans replied on September 1:

> We are pleased to advise you that the terms and conditions contained in our letter of August 23, 1954, are applicable to a production rate of three thousand (3,000) bombs per month with deliveries to begin in April or May, 1955, as well as to the production rate originally specified.

On October 12, 1954, MATCOM instructed the Procurement District to continue negotiations with Evans for the set-aside quantity and to expedite those negotiations to the point of signing a formal contract. Three days later the contracting officer wrote Evans that he had been "authorized to re-enter into negotiations * * * under the terms of the labor surplus provisions of this bid, at an optimum production rate of 3,000 bombs per month, the deliveries commencing May 1955." He asked for Evans' cost breakdowns and other relevant data with a view to scheduling a preliminary conference.

A series of negotiation conferences followed, commencing with a first conference on October 26, 1954. By this time the Evans' official who had conducted previous negotiations with the Government had retired. His son, James J. Strnad, who was president of Lempco and vice president of Evans, took charge

---

6. The contracting officer intended to include Evans on the list of prospective bidders for this new invitation.

of negotiations in behalf of Evans. At the outset of the resumed negotiations the parties agreed, *inter alia*, that the first order of business was to arrive at a consensus, if possible, as to the terms of the basic contract. If agreement could be reached on the basic contract, then the parties agreed to negotiate the terms of a supplemental agreement covering numerous changes which had been made to the original fire bomb specifications.

Throughout the entire negotiations, the contracting officer consistently maintained that, under the applicable regulations governing set-aside procurements, he was not at liberty to consider any unit price for the basic contract in excess of Aircraftsmen's contract price, namely, $76.036 F.O.B. origin. Mr. Strnad vigorously contended, however, that Aircraftsmen's contract price was no longer apogean because of the fact that the Government had now reduced the production rate of 8,000 per month in Aircraftsmen's contract to 3,000 per month for the set-aside procurement. When confronted with Evans' letter of September 1, 1954, quoted in pertinent part above, he argued that in generally accepted business terminology the phrase "terms and conditions" as used in that letter did not include price. In his view, it was contrary to the spirit of the set-aside regulations for the Government to set a lower production rate than that contained in Aircraftsmen's contract without making an upward adjustment in the price so as to compensate Evans for its longer exposure to possible increases in material prices. Nonetheless, he stated that if the conditions imposed by the Government were mandatory and not susceptible to revision, Evans would accept them in the interest of providing work for the persons in its critically distressed labor area. He urged, however, that in all fairness to Evans the Government should either allow an increase in the $76.036 price or consent to the inclusion in the contract of an escalation clause on material prices, particularly aluminum prices. By letter dated November 18, 1954, the contracting officer rejected Strnad's requests in the following language:

That the maximum unit price for which the basic contract can be awarded cannot exceed $76.036 each;

That in accordance with the laws and regulations setting forth procurement for a set-aside quantity, the Contracting Officer is without authority to permit an escalation clause which, when adding the amount of the escalation to the base price, could raise the final price beyond that awarded in the advertised contract.

By an exchange of letters in late November and early December, the parties indicated their agreement on all terms of the basic contract, including a base unit price of $76.036 and a delivery rate of 3,000 bombs per month. Thereupon the contracting officer forwarded to Evans all data relating to subsequent changes in the bomb specifications and asked Evans for an early cost evaluation thereon.

Negotiations ensued with respect to the amount which should be added to the base unit price in order to reflect the increase in costs attributable to the changes made since the award of the Aircraftsmen's contract.[7] Agreement was finally reached on a price increase of $5.844 per bomb. Thus, the total unit price finally agreed upon was $81.88.

Thereupon, the Legal Division of the Procurement District prepared both the basic contract and Supplemental Agreement No. 1 reflecting the $5.844 increase, and the documents were forwarded to Evans by the contracting officer on January 28, 1955, together with a request for expeditious execution and again denying Evans' continuing request for inclusion of a price escalation clause. Thereafter, some mutually agreeable

---

7. Throughout these subsequent negotiations, Mr. Strnad continued to press, without success, for the inclusion in the contract of an aluminum price escalation clause.

modifications of no relevance here were made to the documents, and in their final form they were executed, first, by Evans in early February and then by the contracting officer in late February 1955.

Meanwhile, Aircraftsmen were experiencing difficulties in the performance of its non-set-aside portion of the fire bomb procurement. In late January 1955, representatives of Aircraftsmen advised the contracting officer that it had been subjected to aluminum price increases which could have a disastrous effect on Aircraftsmen in its performance of the fire bomb contract, and they requested the addition of an aluminum price escalation clause to the contract. On February 15, the contracting officer professed his uncertainty as to Aircraftsmen's position and inquired whether Aircraftsmen desired its request to be treated as an application for relief "under Section 30, Part IV" of the procurement regulations. By letter dated February 23, 1955, but not received by the contracting officer until March 2, 1955, Aircraftsmen advised that it did desire its request to be treated as an application for relief, and it attached additional documentation in support thereof.

Believing he was without authority to act on Aircraftsmen's request for the aforesaid relief as authorized by Title II of the First War Powers Act;[8] the contracting officer forwarded it to MAT-COM on March 15, 1955, together with his memorandum-indorsement recommending that the requested relief be denied "at this time" without prejudice to resubmission thereof following completion of the contract. On April 29, 1955, MAT-COM denied Aircraftsmen's request because:

a. Contractor has not established any loss under this contract within the contemplation of APP 30–406.

b. The increases in the cost of aluminum alleged by contractor are such that normally should be taken into consideration by every bidder submitting a bid on a fixed-price contract.

In subsequent conferences with Aircraftsmen's representatives, the contracting officer suggested that Aircraftsmen amend and enlarge its claim for Title II relief so as to encompass possible alternative grounds because, by this time (late June 1955), it seemed to him that even the granting of an aluminum escalation clause would be insufficient to overcome Aircraftsmen's many problems.

On August 12, 1955, Aircraftsmen resubmitted its Title II claim as amended and enlarged. The revised claim took the form of a lengthy letter to which were attached many exhibits, schedules, and financial statements. Among other things, the claim contained analyses of mistakes, underestimations and miscalculations on the original bid by Aircraftsmen's prior management, further data and information on increased aluminum costs due to price increases, a statement regarding freight increases, computations showing the actual contract loss and future projected losses, and a lengthy discussion of the experimental nature of the fire bomb resulting in

8. Since the early days of World War II, the main defense agencies have been authorized to grant discretionary relief to contractors suffering losses on account of mistakes. Title II, Section 201, First War Powers Act, 55 Stat. 838 (1941); Executive Order No. 9001, 6 F.R. 6787 (1941); Act of Jan. 12, 1951, 64 Stat. 1257; 50 U.S.C. App. Sec. 611 (1952 ed.); P.L. 85–804, 72 Stat. 972, 50 U.S.C. Secs. 1431–1435 (1958). The underpinning for the granting of relief must be a finding that such action would facilitate the national defense or prosecution of the war. See Kramer, Extraordinary Relief for War Contractors, 93 U. of Pa.L. Rev. 357, 360 (1945); Correction of Mistakes in Contracts Under Public Law 85–804, Government Contracts Monograph No. 1, p. 4 (The Geo.Wash.Univ.) (1961). Title II relief has been referred to variously as "far-reaching," "extraordinary," and "a snare and a delusion." See Fain and Watt, War Procurement—A New Pattern in Contracts, 44 Col.L. Rev. 127, 199 (1944) and McClelland, Title II—One Year Later: A Legislative Midsummer Night's Dream, 62 Dick.L. Rev. 327 (1958).

manifold production and testing problems.

On October 3, 1955, the contracting officer recommended favorable action on Aircraftsmen's amended claim, as did also a special board established in MAT-COM. After a hearing on October 25, 1955, the Army Contract Adjustment Board issued a decision dated October 28, 1955, containing the following findings:

\* \* \* \* \* \*

a. That the completion of the performance of Contract No. DA–30–070–Cml–605 is essential to the national defense.

b. That because of losses sustained in the performance of Contract No. DA–30–070–Cml–605 the applicant will be unable to complete the performance of the contract unless it receives an increase in the contract price.

c. That an increase in the contract price to $87.9391 per unit, F.O.B. origin, for all units delivered and to be delivered, and modification of the contract to provide for delivery of all units F.O.B. origin will enable the applicant to complete the performance of Contract No. DA–30–070–Cml–605.

d. That the amendment authorized herein will facilitate the national defense.

\* \* \* \* \* \*

Accordingly, the Chief Chemical Officer was authorized to amend Aircraftsmen's contract so as to increase the unit price retroactively from $76,036 to $87.-9391, all deliveries to be F.O.B. origin. The Board took specific note of the fact that the new price of $87.9391 was "much less (over $7) than the estimated reprocurement price."

In February 1956, Aircraftsmen sought further Title II relief and asked the Army Contract Adjustment Board to authorize an increase of the unit price per bomb to $95. The Board held a hearing on March 1, 1956, and issued a decision denying the requested further relief on March 23, 1956. The Board noted that its favorable action of October 28,

1955, was based on advice concerning the need for the fire bomb at that time. However, current advice to the Board indicated that the bomb procurement was no longer essential to the Air Force, and none of the Armed Services considered that either Aircraftsmen or its parent company were essential to them. Accordingly, the Board concluded that it could no longer make the required finding that the granting of relief would facilitate the national defense, and the application for further relief was, therefore, denied. In the same month, an involuntary petition in bankruptcy was filed against Aircraftsmen, and on March 26, 1956, the contracting officer terminated Aircraftsmen's contract for default in meeting the delivery schedule. Aircraftsmen was adjudicated a bankrupt on April 17, 1956.

In October 1956, Evans also applied for Title II relief. After a hearing on June 18, 1957, the Army Contract Adjustment Board denied Evans' application on the ground that the combined resources of both Evans and its parent, Lempco, were such that losses under the fire bomb contract would not substantially impair their productive capacities. On March 25, 1958, the Board denied Evans' request for reconsideration as well as an alternative ground for relief asserted by Evans on a theory of mutual mistake of fact.

Evans now asks this court to reform its contract. It says that it was misled and defrauded by the contracting officer, or that, at least, its claim for reformation is meritorious because of a mutual mistake of fact.

■ I cannot agree that, under the circumstances of this case, Evans is entitled to contract reformation. To show his entitlement to such extraordinary relief, a plaintiff must produce evidence "of a very clear and convincing character." Associated Traders, Inc. v. United States, 169 F.Supp. 502, 506, 144 Ct. Cl. 744, 750 (1959). And see 3 Corbin on Contracts, Sec. 614, particularly the numerous cases cited in footnote 17. The evidence produced by Evans in this case

consists essentially of an attack on the contracting officer and is far from "clear and convincing." What is "clear and convincing" on this record, its single most obvious fact, is the contracting officer's inflexible insistence during all negotiations that the unit price in the basic set-aside contract could in no event exceed the award price (as added to by the General Accounting Office) for the non-set-aside contract, namely, $76,036.[9] Short of deliberate myopia, Evans' representatives simply could not have misunderstood his position in this regard. He reiterated it almost *ad nauseam*.

■ Whether the contracting officer was right or wrong in this interpretation of the set-aside regulations seems beside the point.[10] Typically, the remedy of reformation is intended to give relief from a contract which does not conform to antecedent expressions on which the parties have agreed. It is not a proper remedy for the enforcement of terms to which the defendant never assented. 3 Corbin on Contracts, Sec. 614, supra.

■ Here there can be no doubt that the written contract precisely expressed the terms and conditions upon which both parties had agreed (Evans reluctantly) in their antecedent negotiations. Evans contends, however, that there was a mutual mistake of fact. It says that such mutual mistake is to be found in the assumption by both Evans and the contracting officer that Aircraftsmen's price per bomb was definitely and finally fixed for the non-set-aside procurement at $76.036 whereas, in fact, it developed that, by reason of the Title II relief later afforded to Aircraftsmen, that company actually received $87.9391 per bomb. Evans points to this court's decisions in Poirier & McLane v. United States, 120 F.Supp. 209, 128 Ct.Cl. 117 (1954), Panama Power & Light Co. v. United States, 278 F.2d 939, 150 Ct.Cl. 290 (1960) and National Presto Industries, Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749 (1964) cert. den., 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965), as justifying reformation because of such mutual and, as it developed, mistaken assumption.

Those cases, however, are inapposite. In *Poirier & McLane*, both the Government and the contractor believed that the "prevailing wage rate" which the contractor was required by the contract to pay its labor had been set at 85¢ per hour. As a matter of fact, however, the actual prevailing rate was $1.00 per hour, and since the court found that both parties intended that the contract should contain the actual rate whatever the figure, it reformed the contract to reflect such intent. By contrast, here there can be no doubt of the contracting officer's intent to negotiate a price not in excess of Aircraftsmen's *award price* and that exact amount was accurately known to both parties.

9. He took the same position with respect to the inclusion in the contract of an aluminum price escalation clause on the ground that such a clause could cause an increase in the basic price of $76.036 and hence, in his view, would be illegal. In this connection it is interesting to note his testimony that, assuming he had authority to agree to include such an escalation clause, he felt that because of his negotiating position, he would have refused to do so.

10. In its brief, the Government argues persuasively that the contracting officer's interpretation of the applicable regulations was correct and that he had no alternative other than to insist on the non-set-aside *award* price as the absolute ceiling for the set-aside contract. It is also arguable, however, that the clear prohibition in the statute and regulations against a price differential was intended to apply only where all material provisions in the two contracts were the same, and here there was a substantial difference in the production rate specified in the contracts. This difference may well have neutralized the price differential prohibition and justified the contracting officer in negotiating a higher price for the set-aside procurement. However, as Evans well knew, he rejected any such liberal interpretation of the regulations. Indeed, by its letter of September 1, 1954, supra, Evans seems to have accepted his position.

Likewise, in *Panama Power & Light Company*, the testimony for both parties clearly showed that an ambiguous contract clause did not read as the negotiators had intended it should. The court reformed the clause to reflect the mutual intention. Here, there is no such ambiguity.

In *National Presto Industries*, the court emphasized that:

> \* \* \* To do justice here we need go no further than formulate and apply a rule for cases of mutual mistake in which the contract, properly construed, allocates the specific risk to neither party—and the side from whom relief is sought received a benefit from the extra work of the type it contemplated obtaining from the contract, and would have been willing, if it had known the true facts from the beginning, to bear a substantial part of the additional expenses. 338 F.2d at 111, 167 Ct.Cl. at p. 769.

There is nothing in the present record, however, which indicates that had he been able to forecast Aircraftsmen's Title II relief, the contracting officer would have negotiated with Evans at a higher figure. Since, in his view, Title II relief was entirely noncontractual in nature, and since further, in his view, the *award price* to Aircraftsmen fixed the maximum figure for the set-aside procurement, it is probable that even had he "known the true facts from the beginning" he would have continued to insist that the negotiated price could not exceed $76.036. The court, however, was impelled to an opposite conclusion in *National Presto Industries*, a conclusion which was a major factor in its decision to reform that contract. Evans' reliance on that case is, therefore, misplaced. See Flippen Materials Co. v. United States, 312 F.2d 408, 415, 160 Ct.Cl. 357, 368 (1963).

Apparently recognizing that its claim of mutual mistake of fact is weakly grounded, Evans argues most vigorously that it was misled and defrauded by the contracting officer. It says that he deliberately concealed certain information which was known only to the Government and which was vital to Evans in arriving at its decision to enter into the set-aside contract. The vital information alleged to have been withheld from Evans during the negotiations was that the fire bomb was experimental and that in manufacturing it Aircraftsmen was encountering severe production difficulties, that substantial changes in the specifications and manufacturing methods had to be made in order to produce a satisfactory bomb which, in turn, would necessitate a price revision, that Aircraftsmen's bid had been predicated upon a substantial underestimation of its production costs, that it had become financially impossible for Aircraftsmen to perform the non-set-aside contract at the unit price of $76.036, and that finally Aircraftsmen had filed an application for financial relief which was being processed by the Procurement District. The inevitable result of this alleged concealment, says Evans, was to lead it to believe that Aircraftsmen had experienced no difficulties in performing at the price of $76.036 and that, therefore, Evans could prudently enter into the set-aside contract at the same unit price. To Evans, this was chicanery which, in Macbeth's words, could only "commend the \* \* \* poisoned chalice to the lips."

The difficulty with Evans' position is essentially one of timing. The most this record can be said to support is that during the first two weeks of February 1955, the contracting officer had become aware in a general way that Aircraftsmen was experiencing both production and financial difficulties in its performance of the contract and that it had requested an aluminum price escalation clause. However, the next step which Evans would have the court take is much too long. It says that the contracting officer's failure immediately to communicate this unverified information to Evans' negotiators constituted fraud.

But whatever forebodings he might have had, the contracting officer at this point in time did not know either the specific nature of Aircraftsmen's problems or whether there was any merit to

its complaints. His knowledge as to these matters developed gradually over a period of several months following the execution of the Evans' contract. As a result of conferences with Aircraftsmen's representatives and an investigation of its detailed application for Title II relief filed August 12, 1955,[11] the contracting officer had obtained sufficient verification of Aircraftsmen's allegations so that by October 3, 1955, he felt warranted in recommending favorable action on the Title II application and in certifying that Aircraftsmen's "financial distress was caused by a number of factors, namely: (a) an original underestimation of costs; (b) lack of extensive working capital to carry the contract of this magnitude during shutdown periods necessitated by change orders; and (c) failure to anticipate a rising market in a basic commodity."

 From the foregoing it is clear that as of the end of February 1955, when Evans' contract was fully executed, the contracting officer had only surmises, not verified facts, as to the nature of Aircraftsmen's problems. Obviously, he cannot be charged with fraud, either actual or constructive, in failing to disclose "facts" which he did not actually know to be facts. Cf. Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963); Potashnick v. United States, 105 F.Supp. 837, 123 Ct.Cl. 197 (1952); and Ragonese v. United States, 120 F.Supp. 768, 128 Ct.Cl. 156 (1954), in all of which the Government had actual knowledge as to the nature of the work to be done but did not disclose it

to the contractors leaving them to "flounder on their own." Helene Curtis Industries, Inc., supra, at p. 444 of 160 Ct.Cl. and at p. 778 of 312 F.2d. Evans' claim of fraud fails, therefore, for lack of substantiation in the record.[12]

██ In the final analysis, it is difficult to escape the conclusion that what Evans is really complaining about is the failure of the Army Contract Adjustment Board to give it the same or similar relief from an improvident contract as that afforded to Aircraftsmen.[13] The disparity in the Board's actions does leave one with a sense of unfairness and discrimination. But the courts are powerless to compel the granting of Title II relief which depends entirely upon an administrative determination that such relief would facilitate the national defense. See footnote 8, supra. That determination is committed by the First War Powers Act to the sole discretion of the President or his delegates. See Bolinders Company, Inc. v. United States, 153 F.Supp. 381, 139 Ct.Cl. 677 (1957), cert. den. 355 U.S. 953, 78 S.Ct. 538, 2 L.Ed. 2d 530 (1958) where the court said at 153 F.Supp. 383–384, 139 Ct.Cl. 681:

Except for the First War Powers Act, supra, plaintiff would of course have no basis whatever for asking an increase in the contract price, and the First War Powers Act was not passed for the benefit of contractors or for their relief from an unprofitable contract, but solely for the benefit of the nation as a whole, in order to facilitate

---

11. Aircraftsmen had filed an earlier Title II application under date of February 23, 1955. This document was not received by the contracting officer until after the execution of Evans' contract. But even if it had been received prior thereto, it contained almost no information which would have acquainted the contracting officer with the true nature of Aircraftsmen's problems other than those associated with the continuing increases in aluminum prices. The record is clear that Evans' representatives already knew as much, or more than, the contracting officer about those price increases.

12. There may be merit in the Government's alternative contention that, even assuming the contracting officer was possessed of relevant facts regarding Aircraftsmen's troubles, he was not at liberty legally to disclose those facts to a competitor such as Evans. See 18 U.S.C. Sec. 1905 and ASPR 3–219.4(c), infra. However, due to the failure of proof discussed above, the point need not be reached here.

13. Counsel for Evans firmly deny that this observation reflects the theory of their case.

the prosecution of the war. Atlantic Corporation v. United States, 112 F. Supp. 570, 125 Ct.Cl. 464, 480.

The Act committed to the sole discretion of the President the determination of whether or not an increase in the contract price would facilitate the prosecution of the war. His action, or the action of the agencies to whom he had delegated the power granted, was not subject to review by the courts. *Indeed, the Act conferred no rights on the contractor.* (Emphasis supplied.)

To the same effect are Commonwealth Engineering Co. v. United States, 180 F. Supp. 396, 148 Ct.Cl. 330 (1960), cert. den. 364 U.S. 820, 81 S.Ct. 55, 5 L.Ed. 2d 50 (1960); and Theobald Industries, Inc. v. United States, 115 F.Supp. 699, 126 Ct.Cl. 517 (1953), cert. denied 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954).

In considering Evans' application for Title II relief, the Board was unable to find, as it had in Aircraftsmen's case, that the granting of relief would facilitate the national defense. This seems to have been due to the Board's conclusion on the record before it that, considering the combined resources of Evans and its parent, the losses suffered in Evans' performance of the contract would not substantially impair its productive capacity.[14] Therefore, the Board denied the application, and so far as this court is concerned, that discretionary action put an end to the matter.

For all of the foregoing reasons, plaintiff's petition must be dismissed.

NICHOLS, Judge (dissenting):

There is one reason which leads me to disagree with the trial commissioner's otherwise convincing opinion.

The findings show that in the protracted negotiations leading to execution of the Evans Reamer contract, a ground rule had become established that the Government would not pay more than the Aircraftsmen price and Evans Reamer would not take less. In effect the price had become non-negotiable and was to be determined by an exterior circumstance. But the contracting officer clearly indicated that he looked askance on direct contact between Evans Reamer and Aircraftsmen, which he called, for somewhat obscure reasons, "collusion." Evans Reamer was to look to him for whatever it was to know about the Aircraftsmen contract. In these unique and peculiar circumstances—and, of course, I address my remarks to no others—I believe the contracting officer was under a duty to warn the plaintiff, before its contract was executed by both parties, if he entertained any expectation that the Aircraftsmen price might not hold firm. Breach of this duty should give reason for this court's making available, as circumstances might dictate, the equitable remedies of rescission or reformation. It would not be necessary to level against the officer the harsh accusation of fraud, or at most only of the "constructive" variety. The case would resemble, among decided cases, perhaps most closely that of the contracting officer who knows or should know a bidder has made a mistake in his bid, but awards him the contract without giving any warning. Chernick v. United States, 372 F.2d 492, 178 Ct.Cl. 498 (1967). In that case we passed not one stricture on the contracting officer's good faith, nor did we need to in adjudicating the claim.

If the formal documented application of Aircraftsmen for Title II relief had come in to the contracting officer before the final award to Evans Reamer, and he had not warned the plaintiff, I believe the outcome of the case would have been entirely different. Just a few days make all the difference. The commissioner says (in the opinion, not the findings) that before the award to plaintiff the

14. The contrary was found to be true in the case of Aircraftsmen.

contracting officer had "only surmises, not verified facts, as to the nature of Aircraftsmen's problems * * *." To sustain the result reached, it is vital that this characterization be correct. The commissioner had the officer before him as a witness, and no doubt was as well situated to look into the man's mind as triers of fact ever are. But I question whether any well advised contracting officer would throw out such a broad hint to a contractor to apply for the extraordinary relief, available only to contractors in grave enough difficulty, under Title II, as this one did on February 15, (Finding 30), because of troubles he merely surmised. Their letter to him of February 11, (Finding 29), I would hold of itself afforded more than surmise, disclosing as it did that they had been unable to pay approximately two-thirds of their expenses. I do not think "surmise" is the *mot juste,* and if the commissioner had selected one more in accord with his detail findings, the result might well have been different. I miss here the equitable approach of National Presto Industries, Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749 (1964). If this case is not to go down in history as an instance of atavism in the evolution of law, it must be explained in the peculiar, and to me inexplicable, view the court and the commissioner take as to the ultimate facts.

In Maxwell Dynamometer Company v. United States, No. 120–62, Ct.Cl., 386 F. 2d 855, the Government representatives watched plaintiff struggle in vain to satisfy specifications, which as construed by him, virtually could not be satisfied. In the litigation, the Government contended that the correct construction was much less onerous, and if plaintiff insisted on attempting more, the loss was his. We are holding that the Government is bound by plaintiff's interpretation of the specifications in view of its failure to warn him that he was attempting more than was required. Either it practically construed the specifications as plaintiff did, or if it did not, its failure to warn was "unconscionable" action. As the specifications so construed were defective as impossible to perform, plaintiff we hold is entitled to recover the costs incurred in his vain attempts. While the circumstances are different, the case I believe again, as in *Chernick,* supra, reflects the equitable obligation of a Government contracting officer not to stand by and watch a contractor plunge into an abyss, which he could prevent by divulging information in his possession and relevant to the contract, but hidden from the contractor. The possibly penetrable character of the ceiling on *Aircraftsmen's.* Equitable reformation cumstance, and the court which is deciding *Maxwell Dynamometer,* in my opinion, ought to be able to see more merit in the instant claim than it has been able to do.

I do not conclude that plaintiff's price ought to be reformed to the same as *Aircraftsmen's.* Equitable reformation might be satisfied with some lesser figure. We are not to give plaintiff Title II relief; we are to give plaintiff the least price it might have negotiated had it known Aircraftsmen was to get Title II relief.

The outcome leaves me, as it does the commissioner, "with a sense of unfairness and discrimination," only I think we could and should do something about it.